**OTIS ELEVATOR COMPANY et al.,**
**Appellants,**

v.

**Doris L. BOND, Appellee.**

No. 16242.

Court of Civil Appeals of Texas.

Dallas.

May 14, 1965.

Supplemental Opinion June 4, 1965.

Bailey & Williams, James A. Williams, Strasburger, Price, Kelton, Miller & Martin, Hobert Price, Dallas, for appellants.

Bonney & Wade and Minor Morgan, Dallas, for appellee.

BATEMAN, Justice.

For the facts of this case see our opinion in Otis Elevator Co. v. Bond, Tex.Civ.App., 373 S.W.2d 518, and the opinion of the Supreme Court of Texas in Bond v. Otis Elevator Co., 1965, 388 S.W.2d 681, 8 Sup.Ct. Journal 319.

In reversing our judgment the Supreme Court has held that the evidence shows conclusively that the elevator in question was under joint control of Adolphus Tower and Otis Elevator Company, and that the mishap involved here was one "which does not ordinarily occur without negligence, and is such an accident, that from the mere showing that it happened, negligence of those in control may be inferred," thus making the *res ipsa loquitur* doctrine fully applicable; that the jury finding that Otis Elevator Company negligently failed to properly maintain the elevator is a general finding of negligence, and not a specific finding, as we had thought. Therefore, we were in error in sustaining Otis' points asserting lack of pleadings and no evidence to support this finding. The case has been remanded to us for reconsideration of our holding that there was insufficient evidence to support the same.

In the light of the Supreme Court's opinion, we now hold that, since our decision in this respect was on a theory now found to have been erroneous, the points of error asserting that the evidence was insufficient to support a finding of negligence, were improperly sustained by us and they are now overruled.

The court has also remanded the case to us for determination of the question of excessiveness of the damages found by the

jury. These points were not passed upon by us in our former opinion. The evidence on these points is summarized briefly as follows:

Doris Bond, the appellee, testified that when the elevator stopped suddenly and began bouncing up and down she fell to the floor and injured her left ankle, causing pain and swelling of the ankle. She was treated by Dr. Halley, who operated on her ankle, placing a "pin" in it. She was in Baylor Hospital twenty-nine days; her left leg was put in a long cast which was replaced after six or seven weeks with a shorter one, and the shorter one was removed about April 1, 1960. She said that during this period she could get around on crutches. The short cast was replaced with an elastic bandage and in the first few months she was able to be up for only short periods of time. She could force herself to stay up longer, but she was in considerable pain and after being up for a very short time she had a very bad and noticeable limp, "and drug that leg and foot quite a bit." She gradually began to be able to stand a little more and through the two and one-half years since the accident she has regained quite a bit of use of the foot and leg but still limps when she has been up "a length of time," and is not able to stand very long at a time. She said she still felt pain and discomfort in the ankle, it being most noticeable when she has been standing a little while and is also noticeable when she puts on "heels". She is always conscious of the discomfort with ascending or descending steps. At the time of the trial, she said she was not able to work long hours on her feet; that the pain in the ankle extends up the left side, in her knee, her hip and into her back. She also said that she was extremely nervous, had a great deal of tension and strain and is unable to go above the fourth or fifth floor in elevators and is still very badly affected by any kind of moving machinery, that frequently if she is in an automobile in heavy traffic she suffers from nausea and cold sweating. She also has recurrent nightmares involving the accident, and is unable to do any kind of work that involves any kind of pressure, and doesn't feel that she could take any responsibility "on a job situation."

About two weeks after she got out of the last cast, and was able to get around with the bandage pretty good, she went to work for another company and in about four months she realized she was not able to work full time and arranged to work half time, which she did for about two months. Thereafter she worked for a country club for about three months, after which time she tried to get temporary employment. She sought the aid of a psychiatrist. She worked from September 1, 1961 to December 1, 1961 for a new company being formed, but which did not stay in business long. In 1962 she started working on a part time basis, instructing ladies in a coin-operated dry cleaning establishment. She said her earnings in 1960 were $2,332.50; and in 1961 they were $1,772.50; and in the first half of 1962 were $750; and that her medical expenses were $2,285.81. At the time of the accident she was employed as manager of an employment service office at a salary of $390 a month.

Dr. Ruth Jackson, an orthopedic surgeon, testified that she first saw appellee on November 9, 1961, examined her and took x-ray pictures; that there was a full range of ankle motion and a full range of toe motion, some instability of the ankle joint from side to side, no swelling of the ankle joint at that time, but she noticed a difference in the color of the two legs, indicating a disturbance of the blood supply to the left leg. She found the left knee to be stable but she could feel a crepitus (a creaking or crackling sound in the knee joint). The x-rays showed a metal screw in the left ankle and that the fractured bone had healed.

She next saw Miss Bond on November 13, 1961, again on March 28, 1962 and again on June 1, 1962. She found a good range of motion in the ankle joint, no specific swelling; that she had begun to develop a bunion on the side of the big toe joint which was red and somewhat painful. She said that in her opinion the patient had some disability in

her ankle, had had two bones fractured which were realigned in good position, but that there was still a slight amount of lateral instability or looseness of the joint and that in her opinion, as time goes on and with continued use of the ankle, she will have increasing disability and the amount of the disability is dependent to a great extent upon what she does, that is, how much she has to walk on that foot and how much she has to stand on it, and what her activities are; that in her opinion the patient has had pain in the past and will have pain in the future.

On cross-examination Dr. Jackson testified that she considered Dr. Halley's surgery on the ankle as successful and the alignment of the bones quite good; that when she examined the patient on March 28, 1962, she was having minimal symptoms referable to her ankle, and that "minimal" means a small amount, and that in her opinion the patient will undoubtedly have some minimal amount of permanent residual disability of this ankle; that it is unlikely that the screw which Dr. Halley placed in the ankle will ever have to be removed, but that it is a simple procedure to take it out under a local anesthetic.

Dr. B. C. Halley, Jr., an orthopedic surgeon, testified that he examined appellee's ankle on the date of the accident, December 24, 1959, and found swelling and complaint of discomfort upon any attempted motion; that x-ray studies revealed fractures of two bones in the ankle; that he inserted a screw securing a fragment of the shin bone to the main shaft of the bone; that she was discharged from the hospital on January 21, 1960; that she was put in a long-leg plaster cast which on February 4, 1960 was removed and a short-leg cast applied extending merely to the knee or slightly below it. He said he considered her disability total or "close to total" until November 10, 1960, and partial thereafter. He said that he would presume that there will always be some degree of complaint if it has lasted this long but that he would presume the condition of her ankle would not get any worse than it was at the

time of trial; that she will not have any instability because all stability has been restored; that he wouldn't say that her ankle was just as good as the other one; that when he saw her on March 3, 1960 he encouraged her to do more walking. There was no swelling at that time and minimal complaint upon palpation, and that although there was some complaint, as would be expected on motion of the ankle, it certainly seemed to move well without any marked complaint; that he was pleased with the progress she was making. He saw her again on May 18, 1960 and predicted at that time that in six months she would be able to return to her full normal activities and most likely not have any future difficulty unless it were necessary to remove the screw. He suspected, however, that the greatest difficulty would be aching about the left ankle with over-activity; also that over-activity would bring on an episode of sinivitis, which is an inflammation or irritation of the lining of a particular joint that furnishes fluid to the joints in small amounts so that the cartilage on the ends of the bones will move smoothly, and that this sinivitis will probably be intermittent.

Dr. Halley also testified that the first time he saw Doris Bond was on July 30, 1954, and that she related to him past history of osteomyelitis on the right side of her face, which subsided with repeated treatments of penicillin and streptomycin, and that she had also had x-ray therapy of her throat because of a gland enlargement, also difficulty with her eyes being myopic and getting worse and also night blindness; that she complained of heat flashes on the front of her left shin, which was intermittent for several days; also pain and soreness in her back and left leg and thigh, which had become rather constant; she stated that she had had intermittent low back pain for the past several years; that on examination there was some complaint on palpation over the left sciatic notch; that the lumbar spine was full in range without complaint, other than complaint of stiffness; there was a complaint of tightness of the left leg and soreness in the

left thigh. There was less sensation in one spot on the lateral aspect of the left leg. He said the x-rays taken in 1954 revealed the lumbo-sacral intervertebral disk space to be somewhat thin, which he thought was a congenital condition, together with a mild subluxation of the facet articulation at both the level between the fourth and fifth lumbar vertebrae and the lumbo-sacral level; that the sacroiliac joints appeared to be clear with no evidence of arthritic change.

The appellee Doris Bond, who was 44 years old at the time of the trial, again testified that she had been to Dr. Halley for treatment before the accident in question, in 1954, at which time she had a weakness in the middle of her back and a numbness in her feet; that she had an infected tooth and when two certain teeth were removed her trouble in her back and left leg and the numbness in her feet cleared up.

 We think the above is a fair summary of all the evidence the jury had upon which to determine appellee's damages, which they found to be $31,254. In our opinion this amount is excessive and the record as a whole would justify a verdict of not over $25,000. If appellee will file in this court a remittitur of all sums in excess of $25,000 within fifteen days after this date the judgment will be accordingly reformed and rendered in her favor for $25,000, plus interest and costs; otherwise the judgment will be reversed and the cause remanded for a new trial. 3–B Tex.Jur., Appeal and Error, pp. 555–7, §§ 992, 993; Denning v. Republic Nat'l Bank Bldg. Co., Tex.Civ. App., 294 S.W.2d 888, 897, wr. ref. n. r. e.; Texas & New Orleans Ry. Co. v. Hart, Tex. Civ.App., 350 S.W.2d 227, 233, reversed on other grounds, 356 S.W.2d 901; J. Weingarten, Inc. v. Gauthier, Tex.Civ.App., 305 S.W.2d 181, 198, no wr. hist.; Reiswerg v. Martinez, Tex.Civ.App., 299 S.W.2d 388, 391, no wr. hist.; Sears, Roebuck & Co. v. Jones, Tex.Civ.App., 303 S.W.2d 432, 438, wr. ref. n. r. e.

Affirmed on condition of remittitur.

### Supplemental Opinion

The appellee has filed her remittitur pursuant to and in accordance with the last paragraph of our main opinion. Accordingly the judgment appealed from is reformed by reducing the principal amount recovered by Doris L. Bond against Adolphus Tower Building and Otis Elevator Company, jointly and severally, and by Adolphus Tower Building over against Otis Elevator Company, from $31,254 to $25,000, with interest thereon at the rate of six per cent per annum from November 16, 1962, the date of the original judgment, and as reformed the said judgment is affirmed, including the taxing of all costs against Otis Elevator Company.

Reformed and affirmed.