**AMERICAN BANK OF WACO,**
Texas, Appellant,

v.

**WACO AIRMOTIVE, INC.,**
et al., Appellees.

No. 10–90–068–CV.

Court of Appeals of Texas,
Waco.

Oct. 16, 1991.

Rehearing Denied Nov. 6, 1991.

Susan Kelley-Claybrook and James E. Wren, Haley, Davis, Wren, Bristow & Rasner, P.C., Vance Dunnam, Dunnam & Dunnam, Waco, for appellant.

Dick Clark, Clark & Clark, James O. Terrell and Beverly A. Crowden, Terrell & Crowden, Waco, for appellees.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

Waco Airmotive obtained a jury finding that American Bank of Waco wrongfully offset Waco Airmotive's account to pay notes at the bank. The jury found both actual and exemplary damages, resulting in a judgment against the bank for $599,-959.06. The bank brought thirty assignments of error attacking the theory of recovery, the sufficiency of the evidence to sustain the findings of wrongful offset and loss-of-credit damages, the award of the amount of the funds offset, the award of

exemplary damages, the exclusion of rebuttal evidence, and the failure of the court to allow attorney's fees on an undisputed note balance. We find that the evidence supports the finding of wrongful offset, that the evidence and findings of the jury establish a wrongful dishonor, and that the damages for "loss of credit" were supported by the evidence. We also hold that exemplary damages can be awarded for wrongful dishonor but do not reach the issue of excessive exemplary damages. Because we find that the bank was harmed when the court erred in failing to admit rebuttal evidence, we will reverse the judgment and remand the cause for another trial.

## FACTUAL BACKGROUND

Waco Airmotive was started in 1976 by Colonel Alfred Hess, chiefly to repair aircraft components. By 1979, its main areas of operation were maintenance on airframes, flight instruction, and fuel sales. In January 1979, Waco Airmotive secured a $295,000 Small Business Administration (SBA) loan through American Bank and used approximately $70,000 of the proceeds to pay existing company debts at the bank. The bank made other non-SBA loans to Waco Airmotive in 1979, which were eventually combined in a single note for $18,036 due May 22, 1980.

On July 8, 1980, Waco Airmotive paid the accrued interest and renewed the principal by executing a new note due October 6. The July 8 note was a renewal of the prior note which had been delinquent since May 22. The bank agreed to renew it to remove it from the past-due list and to obtain an interest payment. The new note allowed the bank to declare all of the company's notes due if specified events occurred and waived notice and demand for payment prior to acceleration. According to the terms of the note, the bank could allow Waco Airmotive to remedy any default without waiver and could waive any default without waiving a subsequent or prior default.

On the renewal date, July 8, Waco Airmotive was several hundred dollars overdrawn at the bank. On that date, the bank was aware that Waco Airmotive was delinquent on the SBA loan by seven payments totaling $24,584 and had not paid a majority of the payments which had become due since the SBA loan was made. Waco Airmotive had intentionally allowed the SBA loan to remain in default for several months because of a belief that the SBA would only renegotiate a loan which was delinquent. The bank had financial information in its possession which demonstrated that Waco Airmotive had not had a profitable year since its inception and had accumulated operating losses of approximately $200,000.

On Tuesday, July 22, the bank offset Waco Airmotive's checking-account balance, $31,752.68, to pay the July 8 note in full and to pay delinquent installments on the SBA loan. Later, the SBA required the bank to apply the total amount of the offset against the still-delinquent SBA loan, which resulted in the July 8 note remaining unpaid. In December, Waco Airmotive gave the bank a new note, renewing the amount due on the July 8 note.

The bank sued Waco Airmotive on the December note and Hess on his agreement to guarantee payment of the obligation. Waco Airmotive filed a counterclaim. Immediately prior to trial, the parties stipulated that Waco Airmotive was liable for the unpaid balance of the December note and interest and, under certain circumstances, attorney's fees. The court then realigned the parties so that Waco Airmotive and Hess became the plaintiffs and the bank the defendant.

The jury found that the bank had wrongfully offset the checking account, proximately causing $25,000 in damages to Waco Airmotive for "loss of credit." It awarded Waco Airmotive $500,000 in exemplary damages after finding that the bank's conduct had been willful, wanton or malicious. The jury also found that the face amount of the checks "wrongfully dishonored" was $15,132.50. Although Hess was a party because the bank sought to recover on his agreement to guarantee payment of the note, no question was submitted on any claim by or against him.

## INQUIRY UNDER THE UNIFORM COMMERCIAL CODE

Chapter 4 of the Uniform Commercial Code provides guidance in determining whether the bank lost its right to offset the checking account as to particular funds by first becoming legally obligated to pay $15,132.50 in checks. We will examine four sections of Chapter 4, as they existed on the dates in question, as part of this inquiry: section 4.213(a), to determine when "final payment" of an item has been made by a payor bank; section 4.109, to understand the stages involved in the "process of posting"; section 4.301, to determine the time limit during which a bank may hold an item without a decision to pay or return the item; and Section 4.303, to examine the limits on the time during which a bank may exercise its right to offset an account. *See* TEX.BUS. & COM. CODE ANN. §§ 4.109, 4.213(a), 4.301, 4.303 (Vernon 1968).

Section 4.213(a) provides, in part:

An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

.        .        .        .        .

(3) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith;

*Id.* at 4.213(a). Comment 5 to section 4.213 states:

Exclusive of the external acts of payment in cash or final settlement, the key point at which the decision of [a] bank to pay or dishonor is made is when the bookkeeper for the drawer's account determines or verifies that the check is in good form and that there are sufficient funds in the drawer's account to cover it. Previous steps in the processing of an item are preliminary to this vital step and in no way indicate a decision to pay. However, a more tangible measuring point is desirable than the mere examination of the account of the person to be charged. The mechanical step that usually indicates that the examination has been completed and the decision to pay has been made is the posting of the item to the account to be charged.

*Id.* at § 4.213 comment.

Comment 12 to section 4.213 indicates that the bookkeeper's determination from the available account information about whether a particular item will be paid from an account is subject to supervisory control. *Id.* at § 4.213 comment.

The 'process of posting' means the usual procedure followed by a payor bank in determining to pay an item and in recording the payment including one or more of the following *or other steps as determined by the bank:*

(1) verification of any signature;

(2) ascertaining that sufficient funds are available;

(3) affixing a "paid" or other stamp;

(4) entering a "charge" or entry to a customer's account;

(5) correcting or reversing an entry or erroneous action with respect to the item.

*Id.* at § 4.109 (emphasis added). The comment to section 4.109 states, "[C]ompletion of the 'process of posting' is one of the measuring points for determining when an item is finally paid ... and when ... set-off come[s] too late to affect a payor bank's right or duty to pay an item." *Id.* at comment. The comment further states that the process of posting "involves the two basic elements of some decision to pay and some recording of the payment" and lists some of the typical steps that might be involved in the process of posting. *Id.* Procedures followed by banks in determining to pay an item and in recording the payment vary. *Id.*

Section 4.301 provides, in part:

(a) Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment ... and before its midnight deadline it

(1) returns the item; or

(2) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.

(b) If a demand item is received by a payor bank for credit on its books it may return such item or send notice of dishonor and may revoke any credit given or recover the amount thereof withdrawn by its customer, if it acts within the time limit and in the manner specified in the preceding subsection.

*Id.* at § 4.301(a), (b). The "time limit" to which section 4.301 refers is the midnight deadline—"midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." *Id.* at § 4.104.

Finally, section 4.303(a), which determines when a payor bank loses the right to setoff an account, states in part:

(a) Any ... setoff exercised by a payor bank, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item or to charge its customer's account for the item, comes too late to so terminate, suspend or modify such right or duty if ... the setoff is exercised after the bank has done any of the following:

. . . . .

(4) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith or otherwise has evidenced by examination of such indicated account and by action its decision to pay the item; ....

*See id.* at § 4.303(a).

The comment to section 4.303 indicates that before beginning the process of posting (section 4.213) or at any time while it continues, a payor bank may exercise a right of setoff against the drawer's account which will, in turn, affect the account of the drawer and may eliminate all or part of whatever balance is available to pay the item. *Id.* at § 4.303 comment. After a cash payment, final settlement, or the completion of the process of posting, setoff comes too late and cannot interfere with either the payment of the item or a charge to the customer's account based upon such payment. *Id.* Comment 3 indicates that the omnibus language, "or otherwise has evidenced by examination of such indicated account and by action its decision to pay the item," was necessary to pick up other types of decisive action incapable of specification but where a bank has examined the account to determine whether funds are sufficient and has taken some affirmative action indicating its intent to pay, e.g., actually charging a check to the drawer's account as opposed to tentatively listing the item against the account balance. *Id.*

As we apply these sections to the facts of this case, under section 4.301 the bank could make a valid decision to pay or dishonor an item at any time up to midnight of the next banking day after receipt of the item, if it had not previously completed the process of posting the item as described in sections 4.109 and 4.213(a). *See id.* at §§ 4.109, 4.213(a), 4.301. On the other hand, if the bank earlier decided to pay a particular item or completed the process of posting that item, whichever occurred first, it lost the right to offset the account under section 4.303 as to the funds necessary to pay the item. *See id.* at § 4.303. Thus, whether a bank makes a decision to pay or has completed the process of posting checks can be a fact issue. As we will see, the question was submitted to the jury conditionally so that the jury could determine whether the bank wrongfully dishonored the checks in question if it failed to find that the bank had wrongfully offset the account. *See id.* at §§ 4.109, 4.213(a), 4.301, 4.303.

All of the items (checks) received on Monday, totaling $15,132.50, were processed together and will be considered together. Officers of the bank testified about the internal procedures used by the bank in processing demand items. On the day each item was received, it was entered into the computer, which generated a list of items, the balance in the account, and the account balance if all items were paid.

This list was available on the next banking day, so that the designated personnel of the bank could decide which items to pay within the deadline imposed by section 4.301. *See id.* at § 4.301. This procedure was followed each day. As of Friday, July 18, Waco Airmotive's checking account had a balance of $32,316.25. On Monday, the bank cashed $563.57 in checks which were personally presented at the bank. Other checks totaling $15,132.50 were received on Monday, and because these checks had arrived at the bank either through the mail or by other banking channels, they were processed in accordance with the bank's standard procedures for clearing items not personally presented. On Tuesday, Donald Hudson, the senior loan officer and vice president in charge of the Waco Airmotive account, decided to offset Waco Airmotive's checking-account balance to pay its $18,036 note and to pay delinquent installments on the SBA note. Because of that decision, the bank returned rather than paid the $15,132.50 in checks presented on Monday, and each of them was returned in the prescribed manner. The items had not been marked "paid" and were returned marked "account closed." In three entries the bank reversed the $15,132.50 tentatively charged to the account. Thus, the account balance at the time of the offset was $31,752.68.

## WRONGFUL OFFSET

The bank claims in point twenty-five that the court erred in failing to disregard the jury's finding of wrongful offset and in failing to enter a judgment notwithstanding the verdict because there was no evidence or, alternatively, insufficient evidence that the offset was wrongful.

An attack on the legal sufficiency of the evidence requires that we consider only the evidence and reasonable inferences which may be drawn therefrom which support the jury's verdict, viewed in the light most favorable to the verdict. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We must uphold the jury's finding if there is any probative evidence to support it. *Id.* On the other hand, a factual-

sufficiency challenge necessitates our consideration of all of the evidence. *See In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

The relationship of a bank to a general depositor such as Waco Airmotive is contractual—that of debtor-creditor arising from the depository contract. *See Upper Valley Aviation v. Mercantile Nat. Bank*, 656 S.W.2d 952, 955 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). The nature of the relationship authorizes a bank to offset deposits against a debt of equal amount owed the bank by that depositor, assuming proof of the amount of the debt owed. *Sears v. Continental Bank & Trust Co.*, 562 S.W.2d 843, 844 (Tex.1978); *First National Bank of Schulenburg v. Winkler*, 139 Tex. 131, 161 S.W.2d 1053, 1056 (1942). An offset is not authorized unless there is a mature or past-due debt owed by the depositor to the bank. *Stockyards Nat. Bank v. Presnall*, 109 Tex. 32, 194 S.W. 384, 385 (1917); *Behring Intern. v. Greater Houston Bank*, 662 S.W.2d 642, 652 (Tex.App.—Houston [1st Dist.] 1983, writ dism'd); *Holt's Sporting Goods Co. v. American National Bank*, 400 S.W.2d 943, 945 (Tex.Civ.App.—Amarillo 1966, writ dism'd). A bank also has an equitable right to offset under these circumstances, assuming no waiver has occurred and proper procedures are followed. *First National Bank of Schulenburg*, 161 S.W.2d at 1056. A depositor's remedy for the wrongful offset of a general account is an action for return of the funds—that is, for breach of the depository contract. *Upper Valley Aviation*, 656 S.W.2d at 955.

Thus, under its theory of the case, Waco Airmotive had to prove that the bank lost the right to offset the $15,132.50 by becoming legally obligated to pay that amount in checks drawn against the account, that the bank did not hold a mature obligation and therefore had no right of offset, or that the bank waived its right of offset against the account. The bank clearly had the right to offset $16,620.18 in the account, if it held a matured obligation and if it had not waived the right to offset, because that amount would have remained in the account even if

the bank lost its right to offset the $15,-132.50 by becoming legally obligated to pay the checks drawn against the account prior to the exercise of the offset.

## THE JURY QUESTION

Question one asked the jury whether American Bank wrongfully offset the checking account of Waco Airmotive in July 1980. The Court instructed the jury that a bank may offset the account of a depositor only against a mature or past-due debt; that a debt is not mature or past due until the date for payment has passed; that an unmatured debt may be accelerated only if, after the date the note was signed, (1) the borrower becomes insolvent or (2) the bank in good faith believes itself to be insecure; and that the term "insolvent" means failure or refusal to pay debts in the due course of business. The instruction further advised the jury that a bank waives its right to offset a mature or past-due debt if it intentionally relinquished this right or intentionally conducted itself in a manner inconsistent with this right. Although the record does not reveal which of the possible findings it made, the jury answered question one affirmatively, finding a wrongful offset.

We must determine whether sufficient evidence existed upon which the jury could have found (1) that the bank had not acted in good faith in accelerating the due date of the July 8 note, so that it was not in reality a mature debt on the date of offset, or (2) that the bank waived its right of offset.

The July 8 note provided that the occurrence of certain events would constitute a default under the terms of the note:

(a) Failure of the Borrower ... to pay when due by acceleration or otherwise any amount payable under any of the secured obligations;

.    .    .    .    .

(f) Borrower becomes insolvent or unable to pay his debts as they mature ... ;

.    .    .    .    .

(i) such a change in the condition or affairs (financial or otherwise) of a Borrower ... as in the opinion of the Se-

cured Party impairs the Secured Party's security or increases its risks; or

(j) the Secured Party in good faith deems itself insecure for any reason whatsoever.

The Uniform Commercial Code defines "good faith" as "honesty in fact in the conduct or transaction concerned." TEX. BUS. & COM.CODE ANN. § 1.201 (Tex.UCC) (Vernon 1968). The burden of establishing lack of good faith rested on Waco Airmotive. *See Ford Motor Credit v. Powers*, 613 S.W.2d 30, 34 (Tex.Civ.App.—Corpus Christi 1981, no writ); *Sparkman v. Peoples Nat. Bank of Tyler*, 580 S.W.2d 868, 869 (Tex.Civ.App.—Texarkana 1979, writ ref'd n.r.e.); TEX.BUS. & COM.CODE ANN. § 1.208 (Tex.UCC) (Vernon 1968).

Section 1.208 provides:

A term providing that one party or his successor in interest may accelerate payment or performance ... 'at will' or 'when he deems himself insecure' ... shall be construed to mean that he shall have the power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

TEX.BUS. & COM.CODE ANN. § 1.208 (Tex. UCC) (Vernon 1968). The instruction which accompanied question one did not incorporate the provision of section 1.208 that a party must have a good-faith belief that the prospect of payment or performance is impaired in order to accelerate the time for performance. The instruction authorized the jury to find a wrongful offset if it found that the bank's determination of its insecurity, made "after the date the note was signed," was not made in good faith. In other words, did the bank believe that Waco Airmotive's financial condition had changed during the two-week period since it allowed Waco Airmotive to renew the note to such an extent as to make acceleration of maturity a good-faith action?

Feelings of insecurity are largely subjective and by their very nature subject to abuse by a creditor who arbitrarily and

capriciously uses acceleration as a sword to gain commercial advantage rather than as as shield for protection against any actual impairment of the security. *Brown v. Avemco,* 603 F.2d 1367, 1376–79 (9th Cir. 1979). We believe that the *Brown* court properly characterized a bank's duty to exercise good faith in using an acceleration clause to mature a debt:

> Acceleration clauses are designed to protect the creditor from actions by the debtor which jeopardize or impair the creditor's security. They are not to be used offensively, e.g., for the commercial advantage of the creditor. Acceleration is a harsh remedy with draconian consequences for the debtor. Acceleration is a matter of equity and the courts, including those of Texas, have historically been careful to evaluate the fairness of acceleration in the particular facts of a case. As the Texas Court of Civil Appeals stated in *Parker v. Mazur,* 13 S.W.2d 174, 175 (Tex.Civ.App.1928), courts of equity 'will scan very closely the enforcement of so hard and rigorous a contract.'

In performing their equitable duties, Texas courts have long required that acceleration be reasonable in light of the facts. *Warren v. Osborne,* 97 S.W. 851 (Tex.Civ.App.1906); 125 A.L.R. 318. They would not permit enforcement of acceleration clauses when the debtor's default was due to the debtor's accident or mistake or to the creditor's own fraudulent or inequitable conduct. *Parker v. Mazur,* supra; *Hillier v. Prosper Tex,* 437 S.W.2d 412, 415 (Tex.Civ.App.1969). Nor would they permit acceleration when the facts made its use unjust or oppressive. *Bischoff v. Rearick,* 232 S.W.2d 174, 176 (Tex.Civ.App.1950); *Vaughan v. Crown Plumbing & Sewer Service, Inc.,* 523 S.W.2d 72 (Tex.Civ.App.1975).

The provisions of the U.C.C. impose similar requirements on acceleration in the transactions it governs. The U.C.C. requirements are harmonious with the older equitable tests of reasonableness. Section 1.203 of the U.C.C. imposes an obligation of good faith on the performance or enforcement of every contract or duty within the Code. Section 1.208 fur-ther defines and applies the good faith obligation to options to accelerate at will and requires that the accelerating party 'in good faith believes that the prospect of payment or performance is impaired.' *Brown,* 603 F.2d at 1376; *See also Vaughan v. Crown Plumbing & Sewer Service, Inc.,* 523 S.W.2d 72, 75–76 (Tex. Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). "The question of whether a [party] acts in good faith in accelerating maturity because of his belief that the prospect of payment or performance was impaired can only be decided on a 'case-by-case' approach after acceleration has occurred." *Ford Motor Credit Co.,* 613 S.W.2d at 34. The question must be resolved by the trier of fact. *Id.*

■ Although section 1.208 does not expressly provide that the bank must measure the conditions at the time of the decision to accelerate the due date of the note against those which existed at the time the note was made, the bank does not assert that the instruction should not have included language requiring the jury to so find. *See id.* Thus, the jury was entitled to consider the circumstances at the time the note was made in evaluating whether the bank acted in good faith in ultimately accelerating the due date of the note.

■ Don Hudson, the bank's lending officer responsible for Waco Airmotive's accounts, testified that he had not seen anything in the intervening two-week period to suggest that Waco Airmotive was in a better position than before to repay its loan. Evidence was presented, however, from which the jury could have concluded that Waco Airmotive was in no worse financial position on July 22 than on July 8, including evidence that no additional payments had been missed on the SBA loan, that its cash position was better in terms of funds on deposit at the bank, and that negotiations were then taking place between Waco Airmotive and the SBA to restructure the delinquent loan and obtain additional working capital. Hess and part of his staff had worked during the weekend of July 18 on a proposal for presentation to the bank on Monday, the 21st, and on that day the bank

knew that representatives of Waco Airmotive were in Dallas attempting to restructure the loan. Hudson had never told Waco Airmotive that the bank would not agree to a new SBA loan and the concept had not been rejected by the SBA. Hess testified that when he presented the proposal to Hudson at the bank on the 21st, Hudson stated that he would present it to his board of directors. Yet, the very next day and without warning, Hudson made the decision to offset the checking-account balance to pay the July 8 note and to pay delinquent installments on the SBA note. The evidence also showed that the bank did not entirely follow the advice of the attorney it had consulted about the legality of the offset. That attorney had questioned the status of the note as a mature obligation. Thus, under the court's instruction, the jury could have believed that the bank did not act in good faith in accelerating the due date of the note, considering the circumstances which existed on July 8 (the renewal date) and those which existed on July 22 (the date of the offset), and in using acceleration as the basis to offset the funds in the checking account. *See Brown*, 603 F.2d at 1375–80; *Vaughan*, 523 S.W.2d at 75–76; *Bischoff v. Rearick*, 232 S.W.2d 174, 176 (Tex.Civ.App.—El Paso 1950, writ ref'd n.r.e.); TEX.BUS. & COM.CODE ANN. § 1.208 (Tex.UCC) (Vernon 1968).

If the due date of the note was not accelerated in good faith, then the bank did not hold a "mature" note, and the jury was authorized to find that the offset was wrongful. *See id.; Stockyards Nat. Bank*, 194 S.W. at 385; *Behring Intern.*, 662 S.W.2d at 652; *Holt's Sporting Goods Co.*, 400 S.W.2d at 945. We hold that the record contains more than a scintilla of probative evidence sufficient to support the jury's answer to question one based on a lack of good faith in accelerating the maturity of the note.

The bank does not assert on appeal that it had the right of offset because of the delinquent status of the SBA note, asserting only that the right to accelerate the July 8 note "triggered" the right of offset. Having found that the jury was authorized

to answer question one affirmatively, we do not reach the question of whether the jury was authorized by the evidence to answer question one affirmatively by finding a waiver.

Point twenty-five is overruled.

## WRONGFUL DISHONOR

In several points of error, the bank asserts that Waco Airmotive did not establish a wrongful dishonor and that awards of actual and exemplary damages cannot be sustained on that theory. Because we will later address the specific assertions of error in awarding each type of damages, we must determine if Waco Airmotive established the essential elements of a cause of action for wrongful dishonor.

■ Section 4.402 of the Uniform Commercial Code provides that a payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. TEX.BUS. & COM.CODE ANN. § 4.402 (Tex.UCC) (Vernon 1968). As we have noted, the jury was asked about a wrongful dishonor but did not answer the question because it was conditionally submitted on a negative finding to the question about wrongful offset. Nevertheless, Waco Airmotive urges that the judgment can be sustained because the evidence and findings establish wrongful dishonor.

Viewed as of the close of the evidence and prior to submission of the charge, it cannot be said that Waco Airmotive conclusively proved its cause of action for wrongful dishonor because the dishonor of its checks was not wrongful if the bank had the right to offset the account and did so prior to making a decision to pay or completing the "process of posting" the $15,-132.50 in checks. On the other hand, if the bank did not have the right to offset the account, the wrongful dishonor was established because the bank asserted no other reason for returning the checks. The bank's right to offset the account—the controlling issue—was submitted as the first question for the jury. The answer to question two, inquiring about wrongful dishonor, became immaterial once the jury found

that the bank did not have the right to offset the account. The evidence conclusively shows that Waco Airmotive had sufficient funds on deposit to pay the $15,132.50 in checks presented on Monday and returned on Tuesday. *See First Nat. Bank of Bellaire v. Hubbs,* 566 S.W.2d 375, 378 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ); *Gustason v. Northeast National Bank,* 486 S.W.2d 596, 598 (Tex.Civ. App.—Fort Worth 1972, no writ); TEX.BUS. & COM.CODE ANN. § 4.402 (Tex.UCC) (Vernon 1968). After finding wrongful offset, the jury also found that the wrongful offset was a proximate cause of damages. Thus, we hold that each of the essential elements of a cause of action for recovery of actual damages for wrongful dishonor under section 4.402 was either conclusively established by the evidence or submitted to the jury and found in favor of Waco Airmotive. *See id.*

Question number two was submitted because the jury could have found that the bank had the right to offset the account but, because the bank had decided to pay or had completed the process of posting the $15,132.50 in checks prior to making the decision to offset the account, it had no right to dishonor those checks.

■■■ We are mindful of the cases which hold that an independent ground of recovery or defense not conclusively established by the evidence is waived if no issue thereon is submitted or requested. *See Akin v. Dahl,* 661 S.W.2d 911, 913 (Tex. 1983); *Glens Falls Insurance Co. v. Peters,* 386 S.W.2d 529, 531 (Tex.1965); TEX. R.CIV.P. 279. And when a plaintiff suffers a take-nothing judgment and an answer to an issue or set of issues is prevented by improper conditional submission without objection or request, the plaintiff, the party on whom the burden of obtaining findings rests, waives his right to any benefit he might have received from favorable answers to those issues. *Hopkins v. Standard Fire Ins. Co.,* 554 S.W.2d 270, 273 (Tex.1977); *Strauss v. LaMark,* 366 S.W.2d 555, 557 (Tex.1963). These cases are not applicable to the facts of this case, however, because the controlling issues were

submitted, because question two was properly conditioned under the facts presented, and because no implied finding is necessary to support a judgment in favor of Waco Airmotive for wrongful dishonor.

## DAMAGES FOR LOSS OF CREDIT

■■■ The jury found $25,000 as the amount of damages to Waco Airmotive for "loss of credit" that were the natural, probable, and foreseeable consequences of the offset or dishonor. Because we have determined that the jury's answer that the offset was wrongful also established that the dishonor of Waco Airmotive's checks was wrongful, the damages are recoverable under either theory if supported by the evidence. *See Mead v. Johnson Group Inc.,* 615 S.W.2d 685, 688 (Tex.1981) (wrongful dishonor); *Upper Valley Aviation,* 656 S.W.2d at 955 (wrongful offset); *Farmers & Merchants State Bank of Krum v. Ferguson,* 605 S.W.2d 320, 326 (Tex.Civ.App.— Fort Worth 1980), *reformed & affirmed,* 617 S.W.2d 918 (Tex.1981) (wrongful dishonor); TEX.BUS. & COM.CODE ANN. § 4.402 (Tex.UCC) (Vernon 1968). The bank contends in point twenty-six that the court erred in failing to disregard the jury's finding of damages for loss of credit or, alternatively, in failing to grant its motions for new trial because the evidence was legally or factually insufficient to support the award.

■■■ In reviewing a "no-evidence" point, we must consider only the evidence and inferences tending to support the verdict and disregard all evidence and inferences to the contrary. *See Garza,* 395 S.W.2d at 823. If there is more than a scintilla of evidence of probative force to support a finding of the trier of fact, that finding is binding on an appellate court. *See Behring Intern.,* 662 S.W.2d at 648. On the other hand, if a "no-evidence" point is sustained and the proper procedural steps have been taken, the finding under attack may be disregarded entirely. *See Garza,* 395 S.W.2d at 823.

■■■ In reviewing an insufficient-evidence point, we have a duty to review the entire record. *See In re King's Estate,* 244

S.W.2d at 661. Factual insufficiency of the evidence does not, however, authorize an appellate court to disregard the finding entirely or make a contrary finding in entering a final judgment for one of the parties. *See Garza*, 395 S.W.2d at 823.

██ Although no evidence was presented to quantify its losses, Waco Airmotive presented evidence about the individual checks that were returned and evidence that a fuel supply contract was canceled after its check to the supplier was among the checks which the bank did not pay because of the offset. The supplier then put Waco Airmotive on a cash-on-delivery basis.

██ "Where the law furnishes no specific guide or rule in measuring damages, the amount of damages is largely in the discretion of the jury." *Farmers & Merchants State Bank of Krum*, 605 S.W.2d at 327. Unless an award of such damages is flagrantly outrageous, extravagant, and so excessive as to shock the judicial conscience, it should not be disturbed. *Id.* Based on the record before us, a finding that Waco Airmotive had suffered $25,000 in damages for loss of credit or injury to credit standing in the community because its checks were returned marked "account closed" was supported by factually sufficient evidence. *See Mead*, 615 S.W.2d at 688. We overrule point twenty-six.

## DAMAGES FOR THE OFFSET AMOUNT

In points seven through thirteen, the bank asserts that the court erred in failing to disregard the jury's answer of $15,132.50 to the question inquiring about "the face value of the checks which were wrongfully dishonored" because the jury made no finding of wrongful dishonor and because the award constituted a double recovery. In points fourteen and fifteen, the bank asserts that the court erred in including $16,620.18 in the judgment because that amount is not supported by a jury finding and because, as a matter of law, Waco Airmotive is not entitled to recover the amount of the offset. In the judgment, the $16,620.18 was labeled "damages for wrongful offset" and was calculated by subtracting the face value of the dishonored checks, $15,132.50, from the total amount offset from Waco Airmotive's checking account, $31,752.68.

██ The remedy of recovery of the face amount of a dishonored check is available to the *payee* of a dishonored item which the bank should have paid. *Hamby Co. v. Seminole State Bank*, 652 S.W.2d 939, 941 (Tex.1983); Tex.Bus. & Com.Code Ann. § 4.302 (Tex.UCC) (Vernon 1968). Logically, recovery is not available to the *maker* of a wrongfully dishonored item because the amount of that item ordinarily remains in the account.

██ Ordinarily, the measure of damages for wrongful offset is the amount offset. *Upper Valley Aviation*, 656 S.W.2d at 955. By stipulating that it owed the balance due on the July 8 note, Waco Airmotive recognized that the bank had properly applied the funds to the SBA-guaranteed note and that it had received credit for the sum offset from its checking account. Thus, the inclusion of the $15,132.50 and $16,620.18 as damages in the judgment constituted an impermissible double recovery. *See Kneip v. UnitedBank-Victoria*, 774 S.W.2d 757, 759 (Tex.App.—Corpus Christi 1989, no writ); *First National Bank of Bellaire*, 566 S.W.2d at 378. We overrule points seven, eight, ten, eleven, thirteen and fifteen; we sustain points nine, twelve and fourteen.

## EXEMPLARY DAMAGES

The jury found that the bank acted willfully, wantonly, or maliciously. This finding, coupled with the fact that there was no evidence that the bank made a mistake in returning the checks, laid the predicate for the recovery of exemplary damages, if allowed by law. The bank complains in points one through six that the court erred in entering judgment against it for exemplary damages because Waco Airmotive did not recover actual damages under a theory of recovery which would support an award of exemplary damages.

Because the bank's duty to disburse funds from the Waco Airmotive checking account arose only by virtue of the account agreement, Waco Airmotive's remedy for wrongful offset is in the nature of a breach-of-contract action. *See Upper Valley Aviation,* 656 S.W.2d at 952. Exemplary damages are not recoverable for ordinary breach of contract. *International Bank, N.A. v. Morales,* 736 S.W.2d 622, 624 (Tex.1987); *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986). Thus, the finding of wrongful offset does not support the award of exemplary damages. *See id.*

Waco Airmotive based their claims against the bank, however, on two distinct theories of recovery—wrongful offset of its checking account and wrongful dishonor of checks written on that account.

Citing section 1.106 of the Business and Commerce Code, the bank argues that the liability for wrongful dishonor is statutory and that section 4.402 does not expressly authorize the recovery of exemplary damages for wrongful dishonor. *See* TEX.BUS. & COM.CODE ANN. §§ 1.106(a), 4.402 (Vernon 1968).

Section 4.402 provides:

A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. When the dishonor occurs through mistake, liability is limited to actual damages proved. If so proximately caused and proved, damages may include damages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case.

*Id.* at § 4.402.

Section 1.106(a) provides:

(a) The remedies provided by this title shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this title or by other rule of law.

*Id.* at § 1.106(a). Paragraph 2 of the comment to section 4.402 states that the Code does not attempt to specify whether this liability sounds in contract or in tort. *Id.* at § 4.402 comment.

Although the Supreme Court has not addressed the issue, two courts of appeals have stated that the liability is "statutory" and more in the nature of tort than contract. *Northshore Bank v. Palmer,* 525 S.W.2d 718, 720 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.); *Farmers & Merchants State Bank of Krum,* 605 S.W.2d at 327. The Fourteenth Court of Appeals, without discussing the applicability of section 1.106 of the Business and Commerce Code, distinguished the holding in *Gustason* which relied on Texas Jurisprudence for the proposition that exemplary damages are not recoverable, deemed an affirmative finding on the issue of malice or reckless disregard, and allowed a recovery of exemplary damages where the jury did not find that the dishonor was the result of a "mistake" by the bank. *Northshore Bank,* 525 S.W.2d at 720 (distinguishing *Gustason,* 486 S.W.2d at 598 and 8 Tex.Jur.2d *Banks* § 261). The Fort Worth Court of Appeals, in deciding that the action sounds in tort, criticized the holding in *Gustason* and disallowed exemplary damages for wrongful dishonor only because the plaintiff recovered treble damages under the Deceptive Trade Practices Act. *Farmers & Merchants State Bank of Krum,* 605 S.W.2d at 327 (distinguishing *Gustason,* 486 S.W.2d at 598).

We hold that a finding that a bank acted with malice or in reckless disregard of the rights of its depositor will support a depositor's recovery of exemplary damages for wrongful dishonor of its checks under section 4.402. *See Farmers & Merchants State Bank of Krum,* 605 S.W.2d at 327; *Northshore Bank,* 525 S.W.2d at 720; TEX. BUS. & COM.CODE ANN. § 4.402 (Vernon 1968). Points one through six are overruled.

The bank complains in points eighteen and nineteen that the court erred in awarding $500,000 in exemplary damages

because both the award itself and the amount awarded violate the due-process provisions of the United States and Texas Constitutions. In points twenty through twenty-four, the bank attacks the exemplary-damage award on the basis of factual and legal insufficiency of the evidence and excessiveness. Because the cause will be remanded, the bank's constitutional challenges to the award of exemplary damages are not ripe for decision. *See Wood v. Wood*, 159 Tex. 350, 320 S.W.2d 807, 813 (1959). In view of our remand of the case for another trial, we do not reach the legal and factual sufficiency questions, and we deem it unnecessary, if not improper, to express our opinion on the matter of excessiveness of the award of exemplary damages or the propriety of the ratio of the award of exemplary damages to the actual damages found by the jury. *See Otis Elevator Company v. Bond*, 373 S.W.2d 518, 523 (Tex.Civ.App.—Dallas 1963), *remanded*, 388 S.W.2d 681, *on remand*, 391 S.W.2d 519.

## EVIDENTIARY CHALLENGES

In points twenty-seven through thirty, the bank complains that the court erred in refusing to allow witnesses to testify and in refusing to admit documentary evidence which would have refuted the claim for loss of credit.

The bank offered the testimony of Dr. Jack Tompkins, President of Texas State Technical Institute, to rebut the claim of Waco Airmotive that it was still the operator of the "fuel farm" at T.S.T.I. on July 22, 1980, the date of the offset. The court refused to allow Dr. Tompkins to testify and refused to admit a letter to him dated June 3, 1980, from Aviation Properties Development Company, the owner of the fuel farm, in which Aviation Properties designated Tech–Jet, Inc. as its fuel operator to replace Waco Airmotive.

■■■ Rebuttal witnesses are not exempt from the scope of Rules 166b and 215. *Orkin Exterminating v. Williamson*, 785 S.W.2d 905, 911 (Tex.App.—Austin 1990, writ denied); TEX.R.CIV.P. 166b, 215. Failing to supplement a response results in the loss of the opportunity to offer a witness's testimony at trial; the sanction is automatic unless the offering party establishes good cause which is shown by the record. *See id.*

■■■ The sanction of Rule 215(5) promotes full discovery and deters litigants from violating discovery rules. *Clark v. Trailways, Inc.*, 774 S.W.2d 644, 646 (Tex. 1989); TEX.R.CIV.P. 215(5).

However, this sanction was neither designed nor intended to punish a litigant who cannot, in the exercise of good faith and due diligence, respond to a discovery request in a timely manner. The good cause exception thus provides trial courts with the latitude to permit testimony in those situations and excuse the party's failure to timely supplement the discovery request.... Thus, *a showing of good cause pursuant to rule 215(5) must encompass a showing of good cause for the offering party's failure to respond to proper discovery requests.*

*Clark*, 774 S.W.2d at 646.

■■■ The bank asserts that it showed good cause for its failure to disclose the name of the witness Tompkins because Waco Airmotive had designated Bruce Garner, successor manager of the fuel farm, as a witness only three days before trial and the letter was discovered as a result of an interview with Garner. We believe that the bank made a showing of good cause and that the court abused its discretion in not allowing the witness to testify and the exhibit to be introduced if properly authenticated. *See id.;* TEX.R.CIV.P. 215(5).

■■■ The bank also complains that the court erred in refusing to allow the custodian of records of T.S.T.I. to authenticate a letter dated June 23, 1980, from T.S.T.I. to Waco Airmotive stating that Aviation Properties had designated a new fuel-farm operator. Hess denied ever having seen the letter, and the court excluded it because the bank did not disclose its existence in the course of pretrial discovery. The bank asserts that it did not discover the letter until the day before it was offered into evidence, that the request for production

would not have included the letter had the bank known about it, and that its existence should have been disclosed by Waco Airmotive.

The bank asserted the same good cause for its failure to disclose this letter as the June 3 letter described earlier. We again believe that the bank met its burden of showing good cause and that the court abused its discretion in not allowing the witness to testify and the exhibit to be introduced if properly authenticated. *See id.*

■ Points twenty-seven through thirty are sustained. Because the excluded evidence would have tended to refute the claim of loss of credit, the only recoverable damages which were found by the jury, we cannot say that the error was harmless. *See* TEX.R.APP.P. 81(b)(1).

### THE BANK'S ATTORNEY'S FEES

■ The bank complains in points sixteen and seventeen that the court erred in overruling its motion to modify the judgment to include an award of attorney's fees to the bank. In a pretrial order approved by the court, Waco Airmotive and Hess admitted that principal and interest remained due on the December renewal of the July 8 note and that reasonable and necessary attorney's fees for the services of the bank's attorneys in prosecuting the bank's claim on the note and guaranty through trial would be $12,500, with additional amounts in the event of appeals. The agreed order stipulated that if the bank's claim was reduced by 20% or more as the result of Waco Airmotive's claims, the court would determine any award of reasonable and necessary attorney's fees. The judgment reduced the bank's claim to zero. The bank acknowledged the parties' intent about the stipulation during a post-trial hearing—"[W]hether you choose to award us the full $12,500.00 we stipulated to that Monday morning or not, obviously is up to you, because it was an offset of more than twenty percent." Thus, any award of attorney's fees to the bank under the agreed order was at the court's discre-

tion. As contracts, stipulations between parties are subject to judicial interpretation and construction. *See Hoffman v. Deck Masters, Inc.*, 662 S.W.2d 438, 441 (Tex.Civ. App.—Corpus Christi 1983, no writ). In light of the plain language of the agreed order and the admission by the bank about the intended effect of the stipulation, we cannot find that the court abused its discretion in refusing to award attorney's fees to the bank. Points sixteen and seventeen are overruled.

We reverse the judgment and the remand the cause for a new trial.