## A89A0993. FIDELITY NATIONAL BANK v. KNELLER.
(390 SE2d 55)

BEASLEY, Judge.

Defendant Fidelity National Bank appeals from the denial of its motion for judgment n.o.v. and for new trial after a jury returned a verdict for plaintiff Jeffrey M. Kneller, P.C.

Kneller, a lawyer involved in closing real estate transactions and operating as a professional corporation, brought an action against Fidelity because of its alleged mishandling of the corporation's real estate trust account. He alleged that Fidelity: 1) failed to send timely

monthly account statements; 2) negligently paid a check for $19,193.52 over a written stop payment order; 3) wrongfully paid $70,899.97 on four checks that were forged and refused to credit Kneller's account for that amount; 4) after assuring plaintiff that its checks would be honored, wrongfully dishonored checks drawn on the account; 5) summarily closed the account without notice, marked checks with the notation "account closed" and returned them unpaid to the parties who had received them from closing transactions conducted by plaintiff. Plaintiff asserted that because of these actions its real estate closing practice was destroyed.

The court entered judgment on the jury's verdict for plaintiff: on count one, breach of contract and UCC, the face amount of the four forged checks plus $15,178.59 prejudgment interest, and $7,253.75 costs, including interest and fees plaintiff incurred in borrowing $60,000 replacement funds for the account; on count three, wrongful dishonor of checks, $100,000 consequential damages and $30,000 punitive damages; on count five, Fidelity's bad faith in the transaction, $60,000 attorney fees and expenses of litigation; for defendant on counts two (fraud and misrepresentation by Fidelity in its dealings with plaintiff after discovery of the forgeries); and four (conversion of the funds paid out on the forged checks).

The evidence is construed in favor of the verdict. *Perfect Image v. M & M Elec. Constructors*, 191 Ga. App. 605, 607 (3) (382 SE2d 405) (1989). In 1978, Kneller incorporated his real estate closing practice into a professional corporation, plaintiff in this action. It opened an account with defendant in 1982. During 1983 plaintiff moved its office location and immediately experienced troubles as defendant continued to send statements to the old address despite written notification of change of address and repeated follow-ups by plaintiff to have the address corrected by defendant. Because of the importance of the account, Kneller had an understanding with the former branch managers of the bank that any overdrafts would be paid and if necessary covered by plaintiff. When a new manager, Tutt, came to the bank Kneller met with him in June 1984 to reiterate the problem of late statements because of the incorrect address which the defendant continued to use and with regard to assuring that overdrafts would be paid.

In August plaintiff received six overdrafts which had however been honored. Concerned, Kneller requested his bookkeeper, who was behind in reconciling the late statements, to review all the recent statements for errors. Kneller and his closing secretary began a time-consuming review of the closing files. On September 18 a party to a recent closing notified Kneller that a check he received at closing had been dishonored. Kneller also learned that a check to Bank South Mortgage had been returned by defendant for insufficient funds, but

he was not notified by defendant until September 24.

Kneller met with Tutt seeking an explanation as to why the checks had not been honored and he had not been notified. Kneller stated plaintiff would cover any overdrafts, emphasized that it was imperative because of plaintiff's closing practice that checks not be returned and inquired about the August statement which had not been received. According to Kneller, Tutt was apologetic and explained he was not aware of the checks' return and would take steps to resolve matters and insure against the recurrence of the overdraft problem.

Kneller now arranged with the bookkeeper to conduct a thorough audit of plaintiff's files, which process took about a week. During this time plaintiff received a notice that the trust account was overdrawn by $58,000. To meet this crisis, Kneller arranged a loan for plaintiff in the amount of $60,000 and secured it with personal real estate holdings. Through the time of trial this ultimately resulted in $32,750 in interest and costs. The audit uncovered a discrepancy of $19,193.52. A check in that amount had been issued to Georgia Federal as part of a closing. When Georgia Federal informed plaintiff it had never received the check, plaintiff issued a stop payment order to defendant and sent another check to Georgia Federal. Contrary to the stop payment order defendant paid that check as well as the replacement check. On October 5, Kneller presented this information to defendant requesting a credit for the amount paid on the check with the stop payment order. Although defendant investigated and Tutt admitted it had made an error defendant would not credit plaintiff's account. Plaintiff had to obtain reimbursement from Georgia Federal.

On October 9, while Kneller was at the bank, his secretary discovered two checks on the September statement, one for $2,299.99 and the other for $35,500, which were executed with a stamp facsimile signature of Kneller. Such signature was not authorized under the signature card of the account agreement. Later that same day two additional checks with the same facsimile signature were discovered. They were in the amount of $29,999.99 and $3,099.99. According to Kneller, when Tutt was shown three of the checks he remarked that he could not understand how defendant accepted the checks and conceded it was without authority to do so. Ms. Godwin, introduced as head of security, explained that bank policy forbade honoring facsimile signatures without a resolution from its customer and she agreed defendant had no authority to pay the checks because plaintiff had never given it permission to honor a facsimile signature. Kneller was informed the bank would investigate and as soon as the investigation was completed would credit plaintiff's account. According to witnesses for defendant, Kneller was told defendant would advise him whether the account would be credited only after an investigation.

From Kneller's version, assurances were made that plaintiff's checks would be honored and not returned during the investigation. Kneller signed three forgery affidavits at that time.

The following day, the door to plaintiff's office was found ajar and Kneller called the Decatur Police to investigate. He told Detective Morris about the forgeries and delivered the fourth check to him. At that point, defendant had not notified the police and never did complete the forgery affidavits. It did eventually notify the FBI, and Tutt met with Morris on at least two occasions. Morris endeavored to ascertain who had endorsed and uttered the checks and sought Kneller's aid. Kneller cooperated in several instances but balked at sending his picture to a suspected "middleman" who had indicated he would identify the party who had given him one of the checks. This individual when subsequently shown pictures including one of Kneller obtained by the police from his driver's license, stated that none of them was the individual but added he would say so even if that were not true. The Decatur Police dropped the investigation because the checks were apparently negotiated outside its jurisdiction.

The record shows no independent investigation by defendant of the alleged forgeries, but for a period of time when Kneller inquired as to the progress of the investigation and when the account would be credited he was told that it was still ongoing. Tutt met with his superiors including the president of defendant and it was determined not to credit plaintiff's account because Kneller was a possible suspect. However, the reason articulated was that Kneller refused to cooperate with the police investigation so that it was terminated.

Plaintiff opened a trust account with another bank but there still remained checks generated from closings which were outstanding on the account with defendant. On November 1, Kneller was informed by a client that a check delivered to him had been returned by defendant. When Kneller demanded an explanation from Tutt he was told that defendant had decided to close the account. Kneller entreated with Tutt not to do this because of the damage to plaintiff's business reputation and offered to deposit funds to compensate for any overdrafts. Tutt spoke with his superiors and then told Kneller defendant would not cooperate with him because he had not cooperated with the police. Detective Morris testified that he had not told Tutt that Kneller had not cooperated because he had. He also related that Tutt admitted to him that Tutt believed defendant was liable for the amount of the forged checks.

As a result of defendant's action a series of checks issued by plaintiff were returned marked "account closed." Plaintiff introduced evidence which indicated that firms stopped doing business with closing attorneys who experienced problems with their finances and demonstrated a sharp decline in plaintiff's closing activities beginning

in the third and fourth quarters of 1984 and continuing through 1985 and 1986, when there was virtually no business done by plaintiff corporation. An expert witness projected the amount of business lost and resulting loss of profits based upon a five-year period at over $440,000.

1. Defendant introduced five affidavits by jurors who served on the jury that one of their members was biased against banks and had failed to communicate that information when queried on voir dire. Defendant contends that it was denied a fair trial due to the juror's undisclosed partiality and that the trial court should have granted it a new trial on that ground.

The public policy of this State is to keep jury trials free from suspicion of irregularity or impropriety of conduct. A method for assuring such, and an expression of the policy as a right, is provided in OCGA § 15-12-133. To implement the voir dire and its purpose, counsel are entitled to have truthful answers given to questions propounded to jurors. *Pierce v. Altman*, 147 Ga. App. 22, 24 (248 SE2d 34) (1978). For this reason, defendant's entitlements to the information and to make a choice with regard to it are scrupulously enforced. *Glover v. Maddox*, 100 Ga. App. 262, 266 (5) (111 SE2d 164) (1959).

Nevertheless, a rule restricting an attack on the integrity of the jury is mandated in OCGA § 9-10-9. It permits affidavits of jurors to sustain but not to impeach their verdict. The cases interpreting this code section have strictly adhered to its precepts. "As a matter of public policy, a juror cannot be heard to impeach his verdict, either by way of disclosing the incompetency or misconduct of his fellow-jurors, or by showing his own misconduct or disqualification from any cause." *Bowden v. State*, 126 Ga. 578 (1) (55 SE 499) (1906). *Watkins v. State*, 237 Ga. 678, 683 (229 SE2d 465) (1976) contains a concise statement of the policy considerations.

"The rule of [OCGA § 9-10-9] has a valid and salutary application in disallowing jurors to impeach their verdicts on the basis of statements made to one another in the jury room and the effect of those statements upon the minds of the individual jurors." *Central of Ga. R. Co. v. Nash*, 150 Ga. App. 68, 73 (3) (256 SE2d 619) (1979). While allegations that a juror gave untruthful answers to questions propounded on voir dire furnish a valid basis for reversal, such averments must be supported by evidence of probative value. *Nash*, supra at 72 (3). Affidavits by fellow jurors do not meet this requirement. *Pie Nationwide v. Prickett*, 189 Ga. App. 77 (374 SE2d 837) (1988) [physical precedent], and cases therein cited; *Lozynsky v. Hairston*, 168 Ga. App. 276 (308 SE2d 605) (1983); *Swift v. S. S. Kresge Co.*, 159 Ga. App. 571, 572 (1) (284 SE2d 74) (1981); *Pinkston v. Hagin*, 157 Ga. App. 2 (1) (276 SE2d 67) (1981). Defendant failed to prove its allegation of juror misconduct.

2. Defendant has asserted no error as to the jury's assessment of damages under count one of the complaint (breach of contract and UCC). However, it has set forth several errors alleged to have been committed with regards to count three, which is based on OCGA § 11-4-402, wrongful dishonor of checks.

(a) Defendant insists the evidence failed to show its actions were the cause of plaintiff's business decline. Granted there was evidence tending to show plaintiff's closing activities were lessening prior to the incidents averred in the complaint. There was also evidence Kneller may have phased out real estate closings to devote more time to other interests. There was no direct evidence that any particular concern would not continue to utilize Kneller's services because of the bank's actions. Nevertheless, the evidence of record does not compel a finding for defendant.

*Southern R. Co. v. Ga. Kraft Co.*, 258 Ga. 232 (367 SE2d 539) (1988), cited with approval *Radcliffe v. Maddox*, 45 Ga. App. 676 (2) (165 SE 841) (1932), and held that "the question as to the sufficiency of the circumstantial evidence, and its consistency or inconsistency with alternative hypotheses, is a question for the jury." On appellate review the issue is whether there is any evidence to sustain the finding. In determining if that standard has been met, "The circumstances shown must, in some appreciable degree, tend to establish the conclusion claimed." Id. at 233. As held in *Radcliffe*, supra at 683 (2): "In civil cases all other reasonable theories are excluded when proved circumstances of real and actual probative value cause the jury to find that the preponderance of the evidence is in favor of the hypothesis claimed, as against all other reasonable but less probable theories."

There was evidence that because of the competitive nature of the real estate closing business, firms dealing with closing attorneys quickly learned "through the grapevine" derogatory information about them and as a matter of policy ceased doing business with them, normally without any type of formal notification. Firms which had customarily dealt with plaintiff knew about its "bad check" problems and stopped thereafter. The history of plaintiff's business was one of steady increase, until the third quarter of 1984, with the exception of 1982, a year when real estate sales were off. Although plaintiff's closings may have begun to slide before the check problem surfaced, the jury was authorized to find that defendant's actions were a major cause, even if not the sole cause, of the losses experienced by plaintiff. The evidence did not demand a result contrary to the jury's findings.

(b) Defendant asserts that the evidence of plaintiff's alleged loss of prospective profits was too remote, speculative or uncertain to warrant recovery. It challenges the methodology in the economic analysis for arriving at the figures and specifically points out that the salary

Kneller drew from the corporation is relevant in computing its profits; that in compiling a statistical study of plaintiff's business its expert ignored this factor and did not deduct salary in the computations. Defendant cites *Southern Bell Tel. &c. Co. v. Kaminester*, 400 S2d 804, 807 (Fla. App. 1981), as authority for the proposition that in the computation of net profits of a professional corporation the failure to deduct salary rendered proof of damages inadequate as a matter of law.

Plaintiff counters with *Bettius & Sanderson v. Nat. Union Fire Ins. Co.*, 839 F2d 1009, 1012 (4th Cir. 1988), where the *Kaminester* rationale was rejected and profits were found to include salary paid to the sole owner of the professional corporation. It exposits a sounder rationale. Besides, the jurors were aware of the salary paid to Kneller and the issue involved was brought to their attention by cross-examination. Moreover, since the expert testified that plaintiff suffered a projected loss of $440,612, and the jury returned a verdict for $100,000, it may be assumed that the factors argued by defendant were taken into account by the "doctors of doubt." See *Central R. Co. v. Ferguson & Melson*, 63 Ga. 84, 85 (2) (1879).

The consequential damages were not unsustainable as a matter of law.

(c) Defendant contends that in an action for wrongful dishonor under OCGA § 11-4-402 punitive damages may not be recovered because the action is contractual. See OCGA § 13-6-10; *Pelletier v. Schultz*, 157 Ga. App. 64 (276 SE2d 118) (1981). It also relies on the Uniform Commercial Code provision that "neither consequential or special nor penal damages may be had except as specifically provided in this title or by other rule of law." OCGA § 11-1-106 (1).

OCGA § 11-4-402 limits compensation to actual damages for wrongful dishonor "when" it is due to mistake, but says nothing about punitive damages for dishonor arising from wilful or intentional conduct. Unless displaced by particular provisions of the UCC, the law existing prior to its enactment is still extant. Pre-UCC case law permitted the recovery of "temperate" damages for wrongful dishonor, without proof of special damages. *Atlanta Nat. Bank v. Davis*, 96 Ga. 334, 337 (23 SE 190) (1895); *Milledgeville Banking Co. v. Carr*, 104 Ga. App. 610 (3) (122 SE2d 284) (1961). "Temperate" damages invoked reasonable compensation for the injury sustained. Recognition was given to the fact that wrongful dishonor was in the nature of a tort, "analogized to an action of libel or slander." *Hilton v. Jesup Banking Co.*, 128 Ga. 30, 32 (1 & 2) (57 SE 78) (1907).

Although the code section does not describe the action for wrongful dishonor as being either contractual or tortious, the vast majority of jurisdictions has found the cause of action to be in tort. See cases cited in 7 Anderson, Uniform Commercial Code, p. 150, § 4-402.3;

Anno., 18 ALR3d 1376, 1396. See, e.g., *Shaw v. Union Bank & Trust Co.*, 640 P2d 953 (Okla. 1981); *Northshore Bank v. Palmer*, 525 SW2d 718 (Tex. Civ. App. 1975). Hawkland, in Vol. 6, Uniform Commercial Code Series, p. 215, § 4-402:05, questions whether the UCC leaves the theory of recovery to the traditional remedy of the jurisdiction, concluding "that the issue before the court will determine the theory," while recognizing the defamatory nature of wrongful dishonor. See Official Code Comment, UCC, 1-201 (44). Compare Official Code Comment, UCC, 4-402 (2). Nevertheless, the precedential history of this court's decisions indicates that wrongful dishonor may be considered a tort.

Defendant offers *Bank South v. Harrell*, 181 Ga. App. 64 (2) (351 SE2d 263) (1986), as support for its position that punitive damages may not be imposed. Harrell failed to show a breach of duty imposed by law and only showed a breach of contract, so punitive damages were not permitted. Here there is a breach of duty imposed by law; we perceive no sound reason for prohibiting punitive damages.

(d) Defendant's request for the following instruction, was refused: "I charge you that a bank has no obligation to honor a check after an account has been closed." The language was taken from *Weber v. Western Bank*, 336 NW2d 652 (S.D. S.Ct. 1983), which differs materially on the facts.

The precise question has not been decided by Georgia's appellate courts. Defendant insists that *Andrews v. Citizens Bank*, 139 Ga. App. 763 (229 SE2d 501) (1976), and *McMichen v. Ga. State Bank*, 148 Ga. App. 680 (252 SE2d 198) (1979), are persuasive regarding its contention that a bank in Georgia is not liable for wrongful dishonor when the account has been closed. Both cases involved insufficient funds in the account; in neither of these cases nor in *Weber* was it shown that the reason for the insufficiency was the negligent or wrongful act of the bank.

As to plaintiff's account, there was proof not only that the wrongful action of defendant was the cause of the insufficient funds but also that defendant's summarily closing the account was not justified. The language of the request which contains no qualification was not adjusted to the facts and was properly refused.

(e) Defendant enumerates as error the failure to give its written request to charge in the language of OCGA § 51-12-8, which concerns damages too remote to be the basis of recovery. The trial court instructed the jury on the principles found in the code section although not in the exact language requested. This was sufficient. *Hardwick v. Price* 114 Ga. App. 817, 821 (3) (152 SE2d 905) (1966); *Biggers v. Biggers*, 250 Ga. 248, 249 (1) (297 SE2d 257) (1982).

3. Did the trial court err in failing to grant defendant's motion for judgment n.o.v. as to expenses of litigation and attorney fees,

awarded by the jury in plaintiff's count five under OCGA § 13-6-11? Defendant contends there was a bona fide dispute as to the issues involved in counts one and three, the other counts in which defendant was found liable for damages.

A plaintiff may recover for bad faith concerning the transactions and dealings out of which the cause of action arose. OCGA § 13-6-11; *Computer Communications Specialists v. Hall,* 188 Ga. App. 545, 547 (3) (373 SE2d 630) (1988); *Cade v. Roberts,* 175 Ga. App. 800, 801 (334 SE2d 379) (1985). A bona fide controversy within the contemplation of the code section pertains solely to the issue of stubborn litigiousness or causing the plaintiff unnecessary trouble and expense. Despite the existence of a bona fide controversy as to liability, a jury may find that defendant "acted in the most atrocious bad faith in his dealing with the plaintiff." *Powell v. Watson,* 190 Ga. App. 375, 376 (378 SE2d 867) (1989). See also *Ga.-Carolina Brick &c. Co. v. Brown,* 153 Ga. App. 747, 750 (2) (B) (266 SE2d 531) (1980).

There was evidence authorizing the jury to determine that defendant acted in bad faith in the transactions which form the basis for recovery under counts one and three.

4. Defendant's last enumeration of error complains of a statement by the trial court in its recharge to the jury. No objection was interposed and therefore we do not consider the argument made here. OCGA § 5-5-24 (a). *Pittman v. Peebles,* 148 Ga. App. 64, 65 (2) (251 SE2d 30) (1978). It is not urged that the asserted error in the charge rises to the level of OCGA § 5-5-24 (c). See *Hamrick v. Wood,* 175 Ga. App. 67, 68 (2) (332 SE2d 367) (1985).

*Judgment affirmed. Carley, C. J., and McMurray, P. J., concur.*

DECIDED NOVEMBER 22, 1989 —
REHEARING DENIED DECEMBER 20, 1989 —

*Glass, McCullough, Sherrill & Harrold, R. Philip Shinall III, L. James Weil, Jr.,* for appellant.
*Johnson & Montgomery, Harmon W. Caldwell, Jr., Wade H. Watson III,* for appellee.

