2001 SD 43

Ned MARYOTT, Plaintiff and Appellee,

v.

FIRST NATIONAL BANK OF EDEN, South Dakota, Peter Mehlhaff, President of First National Bank of Eden, South Dakota, and Tim Hofer, officer/director of First National Bank of Eden, South Dakota, Defendants and Appellants.

Nos. 21539, 21552.

Supreme Court of South Dakota.

Argued Feb. 13, 2001.

Decided April 4, 2001.

Scott N. Heidepriem, Matthew T. Tobin of Johnson, Heidepriem, Miner, Marlow and Janklow, Sioux Falls, SD, Attorneys for plaintiff and appellee.

Reed Rasmussen of Siegel, Barnett and Schutz, Aberdeen, SD, Attorneys for defendants and appellants.

GILBERTSON, Justice.

[¶ 1.] Ned Maryott (Maryott) sued First National Bank of Eden (Bank), its president and its branch manager under SDCL 57A–4–402 for the wrongful dishonor of three checks. A jury awarded Maryott $600,000 in damages for lost income, lost value of his business and emotional distress. On appeal, we affirm in part and reverse in part.

## FACTS AND PROCEDURE

[¶ 2.] Maryott has owned and operated a cattle-dealing business known as Maryott Livestock Sales near Britton, South Dakota, since 1973. In the cattle industry, Maryott had a reputation for honesty and integrity. Because of his respected reputation, he was considered one of the best dealers in the business. Maryott earned a commission of $.50 per hundred weight on the cattle he sold. In an average year, he would sell approximately 50,000 head of cattle, generating revenues of $175,000.

[¶ 3.] Maryott began doing business with Bank in 1977. Over the years, Maryott had borrowed substantial amounts of money from Bank. During that time, Maryott had never written a bad check, had never incurred an overdraft, and had never been late on a loan payment. On December 29, 1993, Maryott and his wife signed a promissory note in favor of Bank for $176,171.60. That note served as a line of operating credit and was secured by mortgages on Maryott's real estate and security interests on most of his personal property and inventory. Bank valued the property mortgaged by Maryott at $663,861. The note was due on December 29, 1999. On March 13, 1996, the Bank loaned Maryott an additional $100,000, due on November 1, 1996. That note was secured by a security agreement and real estate mortgage.

[¶ 4.] One of Maryott's major customers was the Oconto Cattle Company (Oconto), located in Custer County, Nebraska. Oconto was owned by Warren Bierman, who Maryott had been doing business with for more than twenty years. In the normal course of business, Oconto paid Maryott within six to seven days after shipping the cattle. Between July 16 and August 29, 1996, Maryott shipped 887 head of cattle to Oconto. The value of those cattle was approximately $480,000. After repeated attempts to collect payment from Bierman were unsuccessful, Maryott ceased shipping cattle to Oconto. Maryott did receive two sight drafts from Oconto, drawn on its line of credit. However, these drafts were returned because Oconto's lender had revoked the line of credit. Despite repeated assurances from Bierman that he "was good for it," Maryott never received payment on the 887 head of cattle shipped to Oconto.[1]

[¶ 5.] Bank first became aware of the Oconto situation when the two drafts were returned in mid-September. This situation caused concern to Tim Hofer, Bank's manager, and Peter Mehlhaff, its president. After visiting with Maryott regarding the situation on September 30, 1996, Mehlhaff and Hofer noticed that three large checks had been processed through Maryott's checking account. These checks were payable to Tri–County Livestock Auction for $30,544.38; to Tri–County Livestock (collectively "Tri–County") for

---

1. There was evidence that Bierman was engaged in a check-kiting scheme unrelated to his transactions with Maryott. *Maryott v. Oconto Cattle Co.*, 259 Neb. 41, 607 N.W.2d 820, 824 (2000). Oconto eventually filed for bankruptcy protection after Farm Credit Services cancelled its line of credit. Maryott then brought a replevin action against Oconto in Nebraska district court to recover the cattle. Farm Credit held a perfected security interest in all of Oconto's present and after acquired inventory. Maryott's interest as an unpaid cash seller of goods already delivered to the buyer was determined to be unperfected because he failed to comply with the U.C.C.'s purchase-money provisions. *Id.* at 829. Therefore, Farm Credit's interest in the cattle was superior to Maryott's. *Id.* As Oconto's assets were insufficient to satisfy Farm Credit's claims, Maryott was unable to recover any cattle or receive payment thereon.

$72,070.24; and to Schaffer Cattle Company (Schaffer) for $132,990. Each of these checks had been presented to Bank and paid in full on September 25, 1996. Maryott's checking account had been debited accordingly. In light of their concerns over the Oconto situation and after examining the physical checks, Hofer and Mehlhaff concluded Maryott was involved in or the victim of "suspicious activity."[2] That afternoon, Bank decided to dishonor the three "suspicious" checks, even though Bank was aware such a dishonor was a potential violation of the "midnight deadline" rule found in SDCL 57A–4–302(1). Although Maryott had met with Hofer earlier in the day, he was not informed that Bank intended to dishonor his checks.

[¶ 6.] The next morning, October 1, 1996, Mehlhaff gave notice of dishonor for the three checks by filing a claim for late return with the Federal Reserve. Once the items were dishonored by the Federal Reserve, the funds were returned to Maryott's checking account. Bank immediately froze the assets in Maryott's checking account, meaning any additional checks drawn on his account would not be honored. That same day, Hofer received a call from Don Kampmeier, president of Central Livestock Company (Central). Kampmeier informed Hofer that Central was holding a check for $68,528 from Maryott. Hofer informed Kampmeier that the check would not be honored, despite the fact that Maryott's checking account contained nearly $300,000 at the time.[3] Later that same day, Bank deemed itself insecure and used the proceeds of the dishonored checks to pay down the balance of Maryott's loans, leaving $1 owing on each to maintain its superior priority date in the collateral.

[¶ 7.] Pursuant to the Packers and Stockyards Act, licensed livestock dealers must be bonded. Maryott was bonded in the amount of $70,000. After being informed that Bank would not honor the check it held from Maryott, Central made a claim against Maryott's bond on October 7, 1996. It submitted a claim for $247,030, which included the $68,538 check as well as Maryott's other outstanding debt owed to Central.[4] On October 31, 1996, Schaffer, an intended payee on one of the dishonored checks, also submitted a claim against Maryott's bond. Because the claims exceeded the amount of the bond, Maryott was required to forfeit his dealer's license. Without a license, Maryott could not independently deal livestock, which effectively shut down his business.

[¶ 8.] The payees on the dishonored checks, Tri–County and Schaffer, subsequently sued Bank for the face value of the checks. Bank admitted that it had violated the midnight deadline rule and agreed to settle those claims for an aggregate amount of $168,534.[5] The settlement

---

2. Hofer and Mehlhaff reached this conclusion because the two checks to Tri–County Livestock were endorsed by two different parties, one check was written in pencil, and one check was dated September 19, 1997, rather than September 19, 1996, the latter being the correct date. None of these suspicious markings were noticed by Bank officials until the re-examination on September 30, 1996, five days after they had been paid. Bank was also "suspicious" because Maryott was not keeping them up to date on the Oconto situation and in the words of Hofer, "we just did not know what was going on out there." Bank was unable to confirm that any "suspicious activity" actually occurred. Nor did it undertake any independent investigation into the Oconto situation to verify its suspicions before dishonoring the checks.

3. This amount included the amounts re-credited to Maryott's account after the three checks had been dishonored.

4. Kampmeier testified that Central would not have submitted a claim on Maryott's bond if the $68,538 check had been honored. It would have preferred to work with Maryott to pay off the debt he owed.

5. The Schaffer check was paid in full with interest, one of the Tri–County checks was paid in full, the other was settled for $5,000 because Tri–County had arguably failed to present its claim on that check within the statutory time limit.

amount was then applied against Maryott's line of credit. Maryott commenced this action against Bank on December 5, 1996, alleging breach of contract and conversion, later adding a claim for wrongful dishonor. Summary judgment was granted in favor of Bank as to the conversion claim, and Maryott abandoned the breach of contract claim at trial. A jury trial was commenced on March 27, 2000 on only the wrongful dishonor claim. On March 31, 2000, the jury returned a verdict in favor of Maryott in the amount of $250,000 for lost income, $200,000 for lost value of Maryott's business and $150,000 for emotional distress. With prejudgment interest, the total judgment came to $713,750. After the verdict, the trial court allowed a setoff in favor of Bank for $168,534, the amount of the settlement on the dishonored checks. Bank appeals the jury verdict, raising three issues for our review:

1. Whether the wrongful dishonor of the checks proximately caused Maryott's damages;

2. Whether Maryott was entitled to emotional damages;

3. Whether the damages awarded were excessive.

By notice of review, Maryott raises two additional issues:

4. Whether the issue of punitive damages should have been submitted to the jury;

5. Whether Bank is entitled to a set-off of the jury's verdict.

**ANALYSIS AND DECISION**

[¶ 9.] **1. Whether the wrongful dishonor of the checks proximately caused Maryott's damages.**

[¶ 10.] Bank appeals from the denial of its motion for judgment notwithstanding the verdict. As such a motion is based on, and relates back to, a motion for directed verdict, we "review the testimony and evidence in a light most favorable to the verdict...." *Martinmaas v. Engelmann*, 2000 SD 85, ¶ 20, 612 N.W.2d 600,

606. Without weighing the evidence, we then decide if there is evidence which would have supported the verdict. *Id.* In other words, we apply the abuse of discretion standard to the trial court's ruling. *Id.*

[¶ 11.] SDCL 57A–4–402(b) provides that "[a] payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item." Bank has not appealed the jury's determination that it wrongfully dishonored the three checks. Whether the wrongful dishonor proximately caused Maryott's damages is a question of fact for the jury to decide "in 'all but the rarest of cases.'" *Thompson v. Summers*, 1997 SD 103, ¶ 18, 567 N.W.2d 387, 394 (citing *Bauman v. Auch*, 539 N.W.2d 320, 325 (S.D.1995)). Only when legal minds cannot differ as to the failure of proximate cause is judgment as a matter of law in favor of Bank appropriate. *See Walther v. KPKA Meadowlands Ltd. Partnership*, 1998 SD 78, ¶ 54, 581 N.W.2d 527, 537. Bank claims this is one of those rarest cases. After reviewing the evidence in a light most favorable to the verdict, we cannot agree.

[¶ 12.] Bank's argument is based upon its claim that there is no connection between the three dishonored checks and the damage caused to Maryott, namely the loss of his dealer's license and the closing of his business after Central made a claim against his bond. Bank argues that Maryott had given Central the $68,543 check, knowing that he did not have sufficient funds in his account to cover the check. Therefore, according to Bank, the check would have bounced regardless of whether Bank had dishonored the checks and frozen his account. Hence, according to Bank, the wrongful dishonor did not proximately cause Maryott any damage.

[¶ 13.] Maryott points to testimony that he informed Central on the day he issued the check that he did not have enough funds to cover the check. Central personnel agreed to work with Maryott

and hold the check until Maryott had sufficient funds. When Maryott discovered Bank had dishonored his checks and frozen his checking account, he informed Central of the situation. The president of Central, Kampmeier, then telephoned Hofer, who informed Kampmeier that Bank would not honor the check. Because of the freeze put on Maryott's account, he was essentially out of business at that time, as no future checks would be honored. In the words of Kampmeier, "I had no recourse. I had nothing else I could do, I had to go against his bond at that time." When asked if he would have moved against the bond if the check had been honored, Kampmeier replied, "[m]ore than likely not because he would have— that would have meant he was still in business and can continue in business and he could have probably worked out of his indebtedness to us."

[¶ 14.] In addition, Schaffer, one of the payees on the dishonored checks, also moved against Maryott's bond on October 31, 1996. At trial, the owner of Schaffer testified he would not have filed a claim against Maryott's bond if Bank had honored that check. Bank argues that Schaffer's claim on the bond is irrelevant, as the bond would have been lost because of the actions of Central. We have never endorsed such a restrictive view of proximate cause. Instead, we have stated that "[i]f the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that he will not be absolved from liability merely because other causes have contributed to the result, since such causes, innumerable, are always present." *Leslie v. City of Bonesteel*, 303 N.W.2d 117, 120 (S.D.1981). The wrongful dishonor by Bank was clearly a substantial factor causing the actions taken by Schaffer. The jury was instructed that "[t]he proximate cause need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes injury." This instruction is mandated by our decision in *Leslie. See id.*

Bank's actions clearly caused Schaffer to file a claim on the bond. In addition, Kampmeier testified that but for Bank's actions, Central would not have moved against Maryott's bond. After reviewing the evidence in a light most favorable to the verdict, there is sufficient evidence to support the jury's verdict. Bank has failed to carry its burden of showing that no reasonable minds could differ as to the existence of proximate cause.

### [¶ 15.] 2. Whether Maryott was entitled to emotional damages.

[¶ 16.] Bank argues that the evidence fails to establish the necessary elements for recovery of damages for emotional distress. Bank notes that damages for emotional distress are recoverable in South Dakota only when the elements of either intentional or negligent infliction of emotional distress are proven. *See Stene v. State Farm Mut. Auto. Ins. Co.*, 1998 SD 95, ¶ 29, 583 N.W.2d 399, 404. According to Bank, Maryott has failed to establish the elements of either cause of action. Maryott argues that his emotional damages are recoverable under SDCL 57A–4–402, which provides that a bank is liable for "actual damages proved and may include ... other consequential damages." Maryott argues that damages for emotional distress are part of his consequential damages, and he is therefore not required to establish the elements of intentional or negligent infliction of emotional distress. In the alternative, Maryott claims he has nevertheless met those requirements.

[¶ 17.] Our initial inquiry must be whether SDCL 57A–4–402 has created a new breed of emotional damages or whether those damages are commensurate with theories of recovery already recognized under South Dakota law. This inquiry requires statutory interpretation, which is reviewed de novo as a question of law. *Steinberg v. S.D. Dept. of Military*, 2000 SD 36, ¶ 6, 607 N.W.2d 596, 599. The text of SDCL 57A–4–402 provides no assistance on this issue. Nor does the official com-

ment to the U.C.C. offer guidance as to the requirements to establish emotional damages. *See* Uniform Commercial Code (U.L.A.) § 4–402.

[¶ 18.] In support of his claim, Maryott directs us to *Twin City Bank v. Isaacs*, 283 Ark. 127, 672 S.W.2d 651 (1984). That case involved a wrongful dishonor under U.C.C. § 4–402. The plaintiffs sued their bank and the jury awarded them damages for mental anguish. On appeal, the Supreme Court of Arkansas stated, "[i]n general, the type of mental anguish suffered under § 4–402 does not need to rise to the higher standard of injury for intentional infliction of emotional distress." *Id.* at 654.

[¶ 19.] However, a number of courts have not interpreted § 4–402 so broadly. In *Farmers & Merchants State Bank of Krum v. Ferguson*, 617 S.W.2d 918 (Tex. 1981), a bank froze its customer's checking account, without informing the customer, causing several checks to be wrongfully dishonored. The court stated that, in accordance with Texas law, "[d]amages for mental anguish [under § 4–402] cannot be recovered absent a showing of an intentional tort, gross negligence, willful and wanton disregard, or accompanying physical injury." *Id.* at 921. Likewise, the court in *First Nat'l Bank of New Castle v. Acra*, 462 N.E.2d 1345 (Ind.App.1984) examined a claim of emotional damages for wrongful dishonor in light of its state law requirements for intentional or negligent infliction of emotional distress. The *Acra* court noted that Indiana allowed recovery of damages for emotional distress only when intentionally inflicted or accompanied by a physical injury. *Id.* at 1350. In addition, the California courts require a plaintiff to prove either physical impact and resulting injury or intentional wrongdoing by the defendant before damages for emotional distress can be recovered under § 4–402. *Lee v. Bank of America*, 218 Cal.App.3d 914, 267 Cal.Rptr. 387, 390 (1990). Furthermore, the New Jersey Supreme Court applies a more stringent test,

requiring proof of intentional infliction of emotional distress before emotional damages are recoverable under § 4–402. *Buckley v. Trenton Sav. Fund Soc.*, 111 N.J. 355, 544 A.2d 857, 864 (N.J.1988).

[¶ 20.] Like those jurisdictions just discussed, South Dakota allows recovery of emotional damages only when intentionally inflicted or accompanied by actual physical injury. *Stene*, 1998 SD 95, ¶ 29, 583 N.W.2d at 404. The U.C.C. provides that our common-law is effective in commercial transactions unless specifically displaced by a particular Code section. SDCL 57A–1–103. Because § 4–402 does not define the consequential damages that may be recovered and does not clearly indicate an independent right of recovery of emotional damages, we must interpret that section in light of our precedent which requires a plaintiff to prove either intentional or negligent infliction of emotional distress to recover emotional damages. In *Wright v. Coca Cola Bottling Co.*, 414 N.W.2d 608, 610 (S.D.1987), we noted that:

> three principal concerns continue to foster judicial caution and doctrinal limitations on recovery for emotional distress: (1) the problem of permitting legal redress for harm that is often temporary and relatively trivial; (2) the danger that claims of mental harm will be falsified or imagined; and (3) the perceived unfairness of imposing heavy and disproportionate financial burdens upon a defendant, whose conduct was only negligent....

These concerns are equally applicable today. The best way to balance these concerns while still providing adequate relief for injured plaintiffs is to require plaintiffs to meet the standards already established in this state for the recovery of emotional damages. The simple statement that consequential damages are recoverable under § 4–402 will not convince us otherwise. Therefore, while emotional damages may be recoverable under § 4–402, they are not recoverable unless the plaintiff can establish the requirements of either intentional

or negligent infliction of emotional distress.

[¶ 21.] We must now determine if the evidence introduced by Maryott is legally sufficient to satisfy the requirements of either of those causes of action. When reviewing the sufficiency of the evidence, we accept all evidence favorable to the verdict, and reasonable inferences therefrom, without weighing credibility or resolving conflicts. *State v. Buchholz*, 1999 SD 110, ¶ 33, 598 N.W.2d 899, 905. We will affirm the verdict if there is evidence, which if believed by the fact finder, could support the jury's verdict. *Id.*

[¶ 22.] To recover for intentional infliction of emotional distress, Maryott must show:

1) an act by defendant amounting to extreme and outrageous conduct;

2) intent on the part of the defendant to cause plaintiff severe emotional distress;

3) the defendant's conduct was the cause in-fact of plaintiff's distress;

4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct.

*Stene*, 1998 SD 95, ¶ 31, 583 N.W.2d at 404. For conduct to be deemed "outrageous," "it must be so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* ¶ 32, 583 N.W.2d at 404. While Bank's actions were illegal and irresponsible, they do not rise to the level of outrageous conduct. Nor was any evidence introduced that Bank acted with the requisite intent. Indeed, Maryott did not even argue in his brief that he met the requirements of intentional infliction of emotional distress. Therefore, the issue is

waived. *Spenner v. City of Sioux Falls*, 1998 SD 56, ¶ 30, 580 N.W.2d 606, 613.

[¶ 23.] We have repeatedly held that negligent infliction of emotional distress requires "manifestation of physical symptoms." *Stene*, 1998 SD 95, ¶ 30, 583 N.W.2d at 404; *First Nat'l Bank in Sioux Falls v. Drier*, 1998 SD 1, ¶ 12, 574 N.W.2d 597, 600; *Nelson v. WEB Water Dev. Ass'n, Inc.*, 507 N.W.2d 691, 699 (S.D. 1993). Maryott argues that his clinical depression and the symptoms thereof that resulted from Bank's wrongful dishonor are sufficient to establish "manifestation of physical symptoms." The physical symptoms of his depression included shame, interruption of sleep, and humiliation. We discussed a similar claim in *Drier*, where the trial court refused to instruct the jury that physical injury included a diagnosed severe mental illness. We affirmed the trial court's decision, stating "Driers' proposed instruction is not consistent with South Dakota law because it expands the definition of 'physical injury'...." *Drier*, 1998 SD 1, ¶ 13, 574 N.W.2d at 600.

[¶ 24.] Likewise, Maryott's claim that clinical depression satisfies the requirement of physical symptoms is inconsistent with our established law. Nor can shame and humiliation be classified as physical symptoms. Finally, interruption of sleep on its own cannot be considered a physical symptom that would allow for recovery of emotional damages.[6] Because Maryott has failed to establish the elements of either intentional or negligent infliction of emotional distress, his claim for emotional damages under § 4–402 must fail as a matter of law.

[¶ 25.] **3. Whether the damages awarded were excessive.**

6. Maryott has not alerted us to any case law that would accept interruption of sleep as a physical symptom allowing recovery for negligent infliction of emotional distress. Furthermore, after a review of the record, we were unable to locate any testimony as to the interruption of Maryott's sleep. The only similar testimony came from Dr. Donna Small who testified from her medical notes that Maryott's wife reported Maryott slept a lot while he was depressed.

[¶ 26.] After the jury's verdict, Bank moved for a new trial pursuant to SDCL 15–6–59(a)(5), claiming the damages were awarded "under the influence of passion or prejudice." Bank now appeals the denial of that motion. A motion for a new trial based upon an excessive damages award

> is addressed to the sound discretion of the trial court and a denial of the motion will not be reversed absent an abuse of that discretion.... If the jury's verdict can be explained with reference to the evidence rather than by juror passion, prejudice or mistake of law, the verdict should be affirmed.

*Berry v. Risdall*, 1998 SD 18, ¶ 9, 576 N.W.2d 1, 4. In addition, "it must be remembered that the amount of damages to be awarded 'is peculiarly a question for the jury.' " *Id.* ¶ 10. Finally, "[t]he trial court is best able to judge whether the damages awarded by a jury are the product of passion or prejudice." *Id.*

[¶ 27.] The jury awarded Maryott $250,000 damages for lost income and $200,000 for the lost value of his business. After reviewing the record, we cannot conclude that the jury's verdict could only have been reached through passion or prejudice. Maryott's expert, Don Scholten, first estimated Maryott's lost income based on the average number of cattle sold in the previous four years; 42,334. As a conservative figure, he used 40,000 head per year, with average weight of 700 pounds, earning $.50 per hundred weight. At that rate, Maryott could expect an annual income of $140,000 per year. At the time of trial, three and a half years had elapsed since the wrongful dishonor, so the annual revenues multiplied by 3.5 years amount to $490,000. Scholten also calculated Maryott's damages assuming that Maryott would switch to a consignment based business. This type of business model would produce fewer sales because, according to Maryott's testimony, not as many producers want to use that system. Scholten used Maryott's estimate that

sales would be reduced by one-half. Using the same weight and commission assumptions, Maryott's income would be reduced to $70,000 per year, which multiplied by 3.5 years amounts to $245,000. Based on these calculations there is sufficient evidence by which the jury's verdict can be explained.

[¶ 28.] Nevertheless, Bank contends that Scholten failed to take into account various factors including the failure to include 1995 sales, Maryott's health problems, the fact that he spent winters in Arizona, and the possibility that Maryott could continue to work in some other capacity in the cattle industry. Each of these concerns was raised by Bank during cross-examination, and was taken into account by the jury. Scholten testified that the 1995 sales were not included in the average number of cattle sold because Maryott was working in a salaried position with Central at that time and was not actively brokering cattle through his business. Each of Bank's claims essentially go to the weight that should be given to Scholten's testimony. The jury determined Scholten's estimates were credible. When reviewing a jury verdict, we are "not free to reweigh the evidence or gauge the credibility of the witnesses." *Id.* ¶ 10. The trial court did not abuse its discretion in denying Bank's motion for a new trial as to damages for lost income.

[¶ 29.] The jury also awarded Maryott $200,000 for the lost value of his business. Bank challenges this award, claiming that Maryott's business had value only because of Maryott's ability to buy and sell cattle and the contacts he had developed in the industry. This argument relies heavily on Bank's previous assertion that the loss of Maryott's bond did not proximately cause any damages. As we have determined that claim to be without merit, this argument also fails. Bank's actions caused the forfeiture of Maryott's bond, which effectively put him out of business. On October 27, 1995, after inspecting the property, Bank valued Maryott's

business at $300,000. Hofer later estimated the value to be only $100,000. There was also testimony from Brett Bunger that in early 1996, he entertained an offer to buy Maryott's business for $324,000. The jury's verdict comports to the evidence on valuation and was not the result of passion or prejudice. The trial court did not abuse its discretion in denying Bank's motion for new trial on lost value of Maryott's business.[7]

**[¶ 30.] 4. Whether the issue of punitive damages should have been submitted to the jury.**

[¶ 31.] Before trial, Maryott filed a motion with the trial court to submit punitive damages to the jury. The trial court denied that motion. Maryott now claims the trial court erred in refusing to submit the issue of punitive damages to the jury.

[¶ 32.] Our initial inquiry must be whether punitive damages are recoverable under SDCL 57A-4-402. That section is silent on the issue, but as discussed above, allows for recovery of consequential damages. Whether punitive damages are included under § 4-402 is therefore determined by non-U.C.C. state law. *See* SDCL 57A-1-103; 57A-1-106; *Uniform Commercial Code, supra,* § 4-402, cmt 1. A majority of states that have examined this issue allow punitive damages under § 4-402, but only when a bank's conduct has been malicious, intentional, or fraudulent. *See Gordon v. Planters & Merchants Bancshares, Inc.,* 326 Ark. 1046, 935 S.W.2d 544, 548 (1996); *Maxan Curtain Mfg. Corp. v. Chemical Bank,* 230 A.D.2d 832, 646 N.Y.S.2d 701, 702 (1996); *American Bank v. Waco Airmotive,* 818 S.W.2d 163, 176 (Tex.App.1991); *Lee,* 267 Cal.Rptr. at 390; *Fidelity Nat'l Bank v. Kneller,* 194 Ga.App. 55, 390 S.E.2d 55, 60–61 (1989); *Buckley,* 544 A.2d at 866; *Alaska Statebank v. Fairco,* 674 P.2d 288, 296–97 (Alaska 1983).

[¶ 33.] In South Dakota, punitive damages are permitted in actions other than breach of contract, when a defendant acts with oppression, fraud or malice. SDCL 21-3-2. The breach of a statute, such as SDCL 57A-4-402, is an action "not arising from contract." *Groseth Int'l, Inc. v. Tenneco Inc.,* 440 N.W.2d 276, 279 (S.D. 1989). In light of our statutory authority, we agree that punitive damages are recoverable under § 4-402, but only when there is oppressive, fraudulent or malicious conduct by the bank. Because we have determined that punitive damages are recoverable, we must resolve whether the trial court should have submitted the issue to the jury under SDCL 21-1-4.1.

[¶ 34.] Under SDCL 21-1-4.1, the trial court must find by "clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against." The trial court found that Maryott had failed to satisfy that burden. Before we will reverse the trial court's finding to the contrary, Maryott must show the trial court was clearly erroneous. *Berry,* 1998 SD 18, ¶ 34, 576 N.W.2d at 9. Under this standard, we will reverse only if after reviewing all the evidence, "we are left with a definite and firm conviction that a mistake has been made." *City of Deadwood v. Summit, Inc.,* 2000 SD 29, ¶ 9, 607 N.W.2d 22, 25.

[¶ 35.] We have previously examined the issue of punitive damages in the banking context. In *Vreugdenhil v. First Bank of South Dakota,* 467 N.W.2d 756 (S.D. 1991), the bank's president requested the sheriff break down the door of Vreugdenhil's business so the bank could take possession of its collateral. These actions were a clear violation of Vreugdenhil's constitutional due process rights and we reversed the trial court's decision denying a claim for punitive damages. *Id.* at 760. The bank in *Brandriet v. Norwest Bank,*

---

7. Bank also argues the damages for emotional distress were a result of passion, prejudice or mistake of law. Because of our decision on Issue 2, we need not reach this claim.

499 N.W.2d 613 (S.D.1993), fraudulently misrepresented that Brandriet's loan had been denied, when the application had in fact never been processed. This Court affirmed the trial court's decision allowing a claim for punitive damages. *Id.* at 618. In addition, punitive damages were allowed against a bank when its employee embezzled a customer's funds. *Olson v. Tri–County State Bank*, 456 N.W.2d 132, 135 (S.D.1990). However, we refused to allow punitive damages where there was no evidence that the bank acted with bad faith, ill will or malice toward its customer. *Yankton Prod. Credit Ass'n v. Jensen*, 416 N.W.2d 860, 863 (S.D.1987).

 [¶ 36.] Maryott argues Bank acted with malice when it violated the midnight deadline rule and because of "irregularities" in Maryott's checking account. According to Maryott, these actions show that Bank acted with reckless disregard of his rights. *See Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752, 761 (S.D. 1994). The violation of a statute, on its own, is insufficient to support punitive damages; there must also be oppression, fraud, or malice. *Groseth*, 440 N.W.2d at 279 (citing SDCL 21–3–2). There is no evidence that Bank acted with oppression, fraud, or malice when it violated the midnight deadline rule. On the contrary, it consulted an attorney as well as officials with the Federal Reserve before dishonoring the checks. These parties did not admonish Bank's proposed actions as being oppressive or fraudulent.

 [¶ 37.] The "irregularities" involve an alleged discrepancy between Maryott's monthly statement and Bank's daily activity report. While Bank noted the credits and debits associated with the dishonored checks on its daily activity report,

there was no corresponding credits or debits shown on Maryott's monthly statement. According to Maryott, this creates "the logical inference" that Bank was covering itself and acting with presumed malice. However, that inference is not supported by the testimony at trial. Mehlhaff testified that when items are returned, the transaction is removed from the customer's account. Although Bank's internal records would record the appropriate credits and debits, those transactions would not be shown on the customer's monthly statement, because for purposes of account records, the transaction never occurred. There is no reason to believe Bank was acting with malice simply because it did not record a credit and debit for each returned check on Maryott's monthly statement.

[¶ 38.] Bank suspected Maryott was involved in or the victim of fraudulent activity when it dishonored the checks. Although later events did not support Bank's beliefs, its conduct did not rise to the level of willful, wanton or malicious conduct. In light of our precedent, Maryott has failed to show that the trial court was clearly erroneous in not submitting the issue of punitive damages to the jury.

[¶ 39.] **5. Whether Bank is entitled to a set-off of the jury's verdict.**

 [¶ 40.] After the verdict, the trial court allowed a set-off in the amount of $168,534, the total settlement amount Bank paid on the wrongfully dishonored checks. Maryott claims Bank is not entitled to that set-off. His argument is based on SDCL 57A–4–302, which provides that a bank "is accountable for the amount of" an item when it violates the midnight deadline rule.[8] Maryott argues that because Bank is "accountable" for the

---

8. SDCL 57A–4–302 provides in relevant part:
 (a) If an item is presented to and received by a payor bank, the bank is accountable for the amount of:
 (1) A demand item, other than a documentary draft, whether properly payable or not, if the bank, in any case in which it is not

also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline. . . .

amount of the checks, he is relieved of any obligation on the checks. Therefore, this issue turns on whether Maryott is responsible for the value of the checks after the wrongful dishonor. This is essentially a matter of statutory interpretation, which we review de novo, giving no deference to the trial court's conclusion. *Steinberg*, 2000 SD 36, ¶ 6, 607 N.W.2d at 599.

[¶ 41.] It is clear from SDCL 57A–4–302 that Bank is "accountable" for the amount of a check that is wrongfully dishonored. Therefore, Bank is liable for the face amount of the dishonored checks. *Uniform Commercial Code, supra,* § 4–302, cmt 3. However, this liability extends to the *payee* on the check, in this case, Tri–County and Schaffer. It does not extend to Maryott, who in this case is the *drawer* of the check. *See Waco Airmotive*, 818 S.W.2d at 175. Once Bank made final payment on the checks, in the form of the settlement with the payees, it is no longer "accountable" for the checks under § 4–302. *Uniform Commercial Code, supra,* § 4–302, cmt 3.

[¶ 42.] Indeed, to hold Bank ultimately liable on the dishonored checks would result in a windfall to Maryott. There is no dispute that he owed the amounts of the checks written to Schaffer and Tri–County. Likewise, there is no dispute that Maryott owed the amounts of the two promissory notes held by Bank. Bank used the funds that were credited to his account after the dishonor to pay off the two notes. The net result is that Maryott's funds were used to pay debts other than the ones he intended to pay off. Therefore, Maryott did not suffer any actual damages due to the wrongful dishonor of the checks. *See Raymer v. Bay State Nat'l Bank*, 384 Mass. 310, 424 N.E.2d 515, 520 (1981). Relieving Maryott of all responsibility on the checks would constitute an impermissible double recovery. *Ripple v. Wold*, 1996 SD 68, ¶ 7, 549 N.W.2d 673, 675. The trial court was correct in holding Maryott responsible for the settlement value of the checks and allowing the set-off.

## CONCLUSION

[¶ 43.] We affirm the trial court's denial of Bank's motion for judgment notwithstanding the verdict on the issue of proximate cause. The jury's award of emotional damages is reversed as a matter of law. We affirm the trial court's denial of Bank's motion for a new trial on the issue of damages. The trial court's refusal to submit the issue of punitive damages to the jury is affirmed. Finally, the set-off allowed in favor of Bank was proper.

[¶ 44.] Judgment is affirmed in part, reversed in part.

[¶ 45.] MILLER, Chief Justice, and AMUNDSON and KONENKAMP, Justices, concur.

[¶ 46.] SABERS, Justice, concurs in part and dissents in part.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 47.] The citizens of South Dakota, represented by this Marshall County jury, found that the bank's wrongful dishonor was the cause of Maryott's mental anguish. The majority opinion jumps in the jury box and reverses the jury's award of $150,000 for Maryott's emotional damage which was clearly precipitated by the bank's wrongful conduct. In so holding, the majority opinion sidesteps the legislative pronouncement that when a bank chooses to wrongfully dishonor a properly payable item it is liable for any "actual damages." As the jury's determination is supported by law and fact, it should stand and not be overturned on a whim.

[¶ 48.] SDCL 57A–4–402 provides in part:

A payor bank is liable to its customers for damages proximately caused by the wrongful dishonor of an item. Liability is limited to *actual damages proved* and may include damages for an arrest or

prosecution of the customer or other consequential damages. *Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case.* (Emphasis added). This determination is supposed to be made by a jury on proper instructions, not by the Supreme Court.

[¶ 49.] The instructions to this jury properly stated that the Bank was liable for the foreseeable consequences proximately caused by its conduct. The jury was instructed that emotional distress "means mental suffering, mental distress or mental anguish. It includes all highly unpleasant mental reactions, such as fright, nervousness, horror, grief, shame, anxiety, humiliation, embarrassment, mortification, anger, worry and stress, as well as physical pain." Additionally, "the measure of damages is the amount which will compensate the party aggrieved for all detriment proximately caused thereby." The jury properly found that Maryott suffered emotional damages as a result of the Bank's wrongful conduct.

[¶ 50.] First National Bank of Eden and the majority opinion urge the view that emotional damages are never available unless the torts of negligent infliction of emotional distress or intentional infliction of emotional distress are independently asserted. Though this view is not without support in other forums, I concur with the commentators and courts that maintain that recovery for "actual damages proved" encompasses the mental suffering caused by a wrongful dishonor. The majority opinion's requirement for an independent tort theory of emotional distress to safeguard against baseless claims is an outdated approach supported only by jury distrust. I submit the juries of this state are capable of discerning when actual damages include mental anguish, as they did here.

[¶ 51.] In *Twin City Bank v. Isaacs*, 283 Ark. 127, 672 S.W.2d 651 (1984), the Supreme Court of Arkansas recognized that "the type of mental anguish suffered under § 4–402 does not need to rise to the higher standard of injury for intentional infliction of emotional distress." *Id.* at 654. It further compared these intangible injuries to those types of damages recognized in defamation actions. *Id.* In addressing this issue, we are faced with the economic reality that "embarrassment and humiliation" suffered from the bank's wrongful acts are very real, though sometimes intangible harms. *See id.* The damage to Maryott's reputation and the ensuing effect on his credit, a lifeline in his type of business, created very real and incredible damage. The jury recognized it based on proper instructions and so should we.

[¶ 52.] Leading commentators on the UCC have addressed the issue. "Might one argue that 'actual damages' excludes recovery for mental distress? We think not." White & Summers, Handbook of the Law Under the Uniform Commercial Code § 17–4 p. 675 (2d Ed 1980). Explaining further, White & Summers note: "It is inconsistent to allow recovery for embarrassment and mental distress deriving from arrest and prosecution and to deny similar recovery in other cases. Moreover, cases under the predecessor to 4–402, the American Banking Association Statute, held that 'actual damages' includes damages for mental distress." *Id.*

[¶ 53.] This rationale; coupled with the evidence adduced by Maryott and the jury's findings on proper instructions, demonstrate that the award was proper. Inability on the part of some members of this appellate court to appreciate or recognize these damages is no reason to vacate them. Therefore, I respectfully dissent.